**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**DARIN WINTERS, as personal**
**Administrator of the Estate of**
**Donald Winters**                                                                      **PLAINTIFF**

**V.**                                                   **NO. 4:04-CV-00206 GTE**

**ARKANSAS DEPARTMENT OF HEALTH**
**AND HUMAN SERVICES and  KEITH FERGUSON,**
**Sheriff, in his official capacity as Sheriff of Benton**
**County, Arkansas**                                                                  **DEFENDANTS**


**MEMORANDUM OPINION**

**INDEX TO MEMORANDUM OPINION**

|  |  | **Page No.** |
|---|---|---|
| **I.** | **INTRODUCTION** | **3** |
| **II.** | **PROCEDURAL BACKGROUND** | **3** |
| **III.** | **FINDINGS OF FACT** | **5** |
| | **1.** **Testimony of Darin Winters** | **5** |
| | **2.** **The Last 4 Days and 16 Hours of Donald Winters' Life** | **9** |
| | **(a)** **The Arrest** | **9** |
| | **(b)** **First Visit to Bates Medical Center** | **12** |
| | **(c)** **Arrival at Benton County Detention Center** | **14** |
| | **(d)** **Civil Commitment Hearing** | **23** |
| | **(e)** **Ozark Guidance Center** | **25** |
| | **(f)** **Second Visit to Bates Medical Center** **& Examination by Dr. Diadone** | **30** |
| | **(1)** **Dr. Paul Diadone's Testimony** | **31** |
| | **(g)** **Return to Benton County Detention Center** | **33** |
| | **(1)** **Officer Pelray's Testimony** | **34** |
| | **(2)** **Officer Martinez's Statement** | **34** |
| | **(3)** **Deputy Center's Statement** | **35** |
| | **(4)** **Officer Shane's Statement** | **35** |
| | **(5)** **Sheriff Keith Ferguson's Testimony** | **36** |
| | **(6)** **Investigation Summary** | **39** |

3.      **Cause of Death**                                              40

4.      **Views of Mental Health Experts and Other Interested Parties**    43
        (a)     **Dr. Robin Ross' Testimony**                          43
        (b)     **Dr. Larry Miller's Testimony**                       47
        (c)     **Dr. G. Rick Smith's Testimony**                      51
        (d)     **Other Witnesses**                                    52

5.      **Aftermath of Closing of Highland Hall**                      53

IV.     **CONCLUSIONS OF LAW**                                         61

1.      **Elimination of Certain Claims**                              61
2.      **The Olmstead Decision**                                      67
3.      **Analysis of Remaining Legal Issues**                         73

        (a)     **Official Capacity Liability**                        73
        (b)     **§ 1983 Claims**                                      75
        (c)     **ADA and § 504 Liability**                            76
        (d)     **Sovereign Immunity**                                 79

4.      **Discussion of Critical Circumstances**                       80

        (a)     **Donald Winters' Dual Status: Pre-trial Detainee
                & Civil Committee**                                    80
        (b)     **Time-frame**                                         83

V.      **CONCLUSION**                                                 86

**MEMORANDUM OPINION**

## I.    INTRODUCTION

Mr. Donald Winters, an acutely mentally ill person, died while in the custody of the Sheriff of Benton County, Arkansas.  His son and the administrator of his estate, Darin Winters, brought this action on March 11, 2004, claiming, *inter alia*, that his father's death was caused by the acts and/or omissions of the Defendants.

This case focuses on society's efforts to deal with the acutely mentally ill who at some point end up in our jails.  More particularly, this case deals with pre-trial detainees, that is, those who have been arrested on criminal charges and are awaiting trial; and it also deals more directly with persons under civil commitment orders issued by our state courts.  Mr. Donald Winters occupied both of those statuses during the days between his arrest on December 28, 2002, for criminal trespass, and his death on January 1, 2003.

## II.    PROCEDURAL BACKGROUND

The original Complaint alleged three separate causes of action, all under federal law:[1]  (1) violations of Title II of the Americans with Disabilities Act (ADA); (2) violations of Section 504 of the Rehabilitation Act of 1973; and (3) violations of certain of the deceased's federal constitutional rights via 42 U.S.C. § 1983.  An Amended Complaint was filed on October 1, 2004, and a Second Amended Complaint was filed on March 20, 2005.  The Second Amended Complaint seeks: (1) compensatory damages against the Defendant Arkansas Department of

---

[1]  No pendent state causes of action are alleged.  However, in the post-trial briefs there are suggestions that the Court should consider independent state claims should the federal claims fail.  The Court discusses these non-federal claims elsewhere herein.  (*See* discussion *infra*, at Section IV, 1., entitled "Elimination of Certain Claims").

Human Services (DHA) (the "State Defendant") on the Section 504 claim; (2) compensatory and punitive damages against Defendants Keith Ferguson, Timothy Brasuell, Walter Nelson, Maurice Helms, Toby Cranston, Roberta Martinez, Sergeant See, and Sergeant Montgomery (the "County Defendants") on the ADA claims; (3) "an order requiring the official capacity Defendants to complete a proper self-evaluation and to create a system under which persons with mental illnesses are properly screened and treated while incarcerated across the State of Arkansas"; (4) a Declaratory Judgment concluding that the Defendants' actions have violated Donald Winters' rights under federal law; (5) compensatory and punitive damages against all individual Defendants; (6) hedonic damages; and (7) reasonable attorneys fees and costs.

The County Defendants filed a Cross-Claim against the State Defendants on April 14, 2005, alleging that "any failure to provide proper mental healthcare for Donald Winters" was the result of the State's failure to fulfill its legal obligations. In the event a judgment is rendered against any County Defendant, the Cross-Claim seeks "a cross-judgment in like amount, or requirement, over and against the Arkansas Department of Human Services (DHS) and its Executive Director, Kurt Knickrehm."[2] (Answer to Second Amended Complaint & Cross-Claim, p. 10, Dkt. # 41).

Plaintiff filed a Motion for Partial Summary Judgment against Defendants Kurt Knickrehm and DHS on June 28, 2005. Defendants Knickrehm and DHS responded and filed a Cross-Motion for Summary Judgment on August 10, 2005.

The County Defendants filed a Motion for Summary Judgment against the Plaintiff on October 14, 2005. Plaintiff dismissed his claims against Defendants Timothy Brasuell, Walter

---

[2] Mr. John Selig, Mr. Knickrehm's successor, has by agreement of the parties been substituted for Mr. Knickrehm.

Nelson, Maurice Helms, Toby Cranston, Roberta Martinez, Sgt. See and Sgt. Montgomery, leaving the County Defendants' motion pending solely as to the Defendant Sheriff Ferguson.

On November 10, 2005, the Court granted in part, and denied in part, the County Defendants' Motion for Summary Judgment. The Court granted summary judgment on all individual capacity claims, but denied summary judgment on the official capacity claims.

In a separate Order entered November 10, 2005, the Court denied Plaintiff's Motion for Partial Summary Judgment and the Cross-Motion for Summary Judgment pursuant to a telephone conference held on November 8, 2005. During the telephone conference, the Court discussed some of the applicable law and current developments therein to help set the stage for the trial.

The trial was held January 3 through January 6, 2006, after which the Court took the matter under advisement. Post-trial briefs were submitted by the parties. The Court, after careful consideration of the entire record and applicable law, is now prepared to enter its findings of fact and conclusions of law.


**III.    FINDINGS OF FACT**

      **1.    <u>Testimony of Darin Winters</u>**

Before detailing the facts chronologically from the arrest of Mr. Donald Winters on December 28, 2002, until his death on January 1, 2003, the Court will review the testimony of the Plaintiff, Mr. Darin Winters, the son of the deceased, because that testimony provides important background information as well as the perspective of a vitally interested family member attempting to protect an acutely mentally ill relative and to obtain for that relative the medical and psychiatric services needed to return him to his prior level of functionality.   The

Court was impressed with Darin Winters' testimony.

Darin Winters is not the natural son of Mr. Donald Winters, but they treated each other as father and son from the time Donald Winters married Darin's mother when Darin was eight years old.  Donald Winters was the only father Darin ever really knew.  He testified that his father was an eccentric person, but a wonderful man who had some success in business.  He stated his father never used drugs, was greatly interested in health, jogging ten or twelve miles a week, and that he loved life.

According to Darin Winters, his father had two prior psychotic episodes, one in 1996 and one in the year 2000.

In 1996 Mr. Donald Winters lived by himself in a secluded river cabin located in Missouri.  The cabin had no electricity or running water but was considered "heaven" by his father.  In connection with the 1996 incident, Donald Winters had delusional thoughts and behaved erratically.  The neighbors complained.  He apparently stopped several cars and complained that people were out to kill him.  He was taken to a mental hospital and recovered to his prior functional level.  According to Darin, his father had no additional significant incidents until December 2000.

In 1997 Darin started living with his father.  In December of 2000 his father's behavior again became erratic and paranoid.  He felt that Walmart and the Rogers Police were planting mini-cameras into people to spy on him.  After a stand-off and confrontation with the police, during which his arm was broken, he was taken to Highland Hall where he was treated for almost three weeks and then released.

Late in December of 2000, after his release, his father asked to see a psychiatrist at Ozark Guidance Center.  However, he only went once.  He apparently continued to have some

delusional thoughts until his arrest in December of 2002.  He would talk incessantly about the conspiracy against him and how he had barricaded himself and had a stand-off with a swat team back in December of 2000.

In 2002 Donald Winters had no health insurance and little cash.  He could not pay for medical services.

According to Darin his father had a "bad week" just before Christmas 2002, his condition getting worse on Christmas Eve and Christmas Day. Darin was planning to take his own son to St. Louis to visit relatives and asked his father to come with them.  His father responded that he could not leave because, "something is going to happen."  During the same time period, his father also tried to call Michael J. Fox in order to tell him how to treat his medical condition. Darin did not call the authorities because there was nothing to suggest another incident like two years before.

Darin also testified that his father had been given medication at Highland Hall in 2000, but did not like it.  He was opposed to taking any kind of medicine.  By December 2002 he had been off his medication for almost two years.

Darin stated that his father had been healthy and fit and there was nothing to suggest that he suffered from any physical ailment.  He expressed no complaint of stomach pain and no complaint that consuming food or water hurt or pained him.

When Darin departed on December 27 his father was at work at his job.  Darin wanted to say goodby.  His father responded that he had been jogging and that there was a sniper in a nearby wooded area and he could see the red laser beam from a weapon.

On the night of December 27 Darin received a call in St. Louis from an Arkansas neighbor, complaining that Donald Winters was banging on his door.  The neighbor, Jim Nelson,

had first called the Sheriff's office in Bella Vista before calling Darin.

After Darin received the call from his neighbor, he called the Sheriff's Office in Bella Vista and requested that they pick up his father. He advised the authorities that his father needed mental health services and the Sheriff's Office reported that they were not equipped to provide such services. Darin then received a call from Deputy Brasuell advising him that his father had been arrested for criminal trespass. Officer Brasuell called back a second time and advised that his father was in the Benton County Jail.

Darin returned to Benton County from St. Louis and went to visit his father at the Detention Center on Sunday December 29, 2002, but the officers could not get Mr. Donald Winters to come out of his cell. Darin left without seeing him. He called the Sheriff's Office at 6:00 a.m. on Monday, December 30, 2002 and was advised he would probably be able to visit his father. He called later that morning and was told that his father was banging around in his cell and had to be placed in a suicide jacket.

Darin Winters stated that Captain Drake okayed him to see his father around 2:30 p.m., Monday, December 30. The officers tried to coax Donald Winters out of his cell. They opened the cell door and kept pointing to Darin in an attempt to get his father to come out and talk to him. But his father thought the room was an "acid vat" and he would not enter that room. Lt. Tester then had Darin come into the booking area. It took a while before he was able to approach his father. He asked his father if he trusted him and he replied, "Fuck no, I don't trust you!" He was, nevertheless, able to get his father to drink five or six cups of water. After drinking the last cup Donald Winters grabbed his right side and said, "Oh no, that was the acid." His father stated that if he remained in jail he would be dead before the morning. The visit lasted thirty to forty-five minutes. His father was not in his right mind. He had many bruises and a very haggard

look.  Lt. Tester told Darin that he could take his father out of the Detention Center if he would

assume responsibility for him.  Darin replied, "No," because he could not handle his father in his

then condition.  His father was fully clothed during the visit.

Darin knew that he would have to sign a petition for a civil commitment on Monday,

December 30, 2002.  He had filed a similar petition back in December of 2000 and understood

the process.  The petition was prepared with the assistance of the prosecuting attorney's office.

Mr. Darin Winters inserted the following language in the petition under the caption

"Conduct/Signs Symptoms:"

> Don Winters (my Dad) believes that Rogers P.D., Benton Co. Sheriff's Dept., and
> Wal-Mart are conspiring to have him killed.  He believed this because of a lawsuit
> filed in federal court.  My Dad believed that people close to him are "in" on this
> as well.  My Dad needs professional help to overcome.

Under "Time & Place of Occurrence" Darin stated:

> Starting last Thursday, December 27, 2002, through currently.  Place is our home
> that we share in Bella Vista.

(Commitment Petition, Defendants' Exh.3).

2. **The Last 4 Days and 16 Hours of Donald Winters' Life**

(a) **The Arrest**

Deputy Timothy Brasuell worked at the Bella Vista Division of the Benton County

Sheriff's Office starting in February 2002.  He was on duty during the night of December 27 –

December 28, 2002.  Previously he had worked at the Rogers Police Department.  While at the

Rogers Police Department he had talked to Mr. Donald Winters by telephone two or three times

at which times Mr. Winters complained about Wal-Mart or doctors.  Officer Brasuell had never

met Mr. Winters face to face until December 28, 2002.

The Sheriff's Office had received a call from Mr. Winters' son, Darin Winters (who was

then in St. Louis, Missouri) advising that his father had mental problems and had gone over to their next door neighbor's house and was banging the neighbor's front door.  He also advised that his father was excessively strong and that they would need two deputies and two mental health professionals to deal with him.

Officer Brasuell and Deputy Nelson Walter who was riding with him went to the residence located at 7 Lyndhurst Drive in Bella Vista.  Deputy Maurice Helms who was riding in another unit met them at the residence to act as backup.  They found Mr. Donald Winters knocking on the front door.  When Mr. Winters saw the officers he told them that he and the officers were going to be executed.  Mr. Winters would give them a blank stare when they tried to talk to him.  The officers were unable to establish a meaningful dialogue with him.  The officers told him to go to his home which was located next door at 5 Lyndhurst Drive.  He responded that if he went home the officers would kill him.  He also talked about a federal lawsuit.

Officer Brasuell told Mr. Winters that if he did not go home that he would be arrested for criminal trespass.  Mr. Winters did not acknowledge this message so Officer Brasuell began escorting him to the patrol car.  Suddenly Mr. Winters tightened his body, struggled to pull loose and refused to walk.  He was then taken to the ground by the three officers and handcuffed.  Mr. Winters was very strong.  It took all three offices to handcuff him and load him into the patrol car.  Winters bit and kicked the officers.

Officer Helms was a field deputy at the Bella Vista Sheriff's Office.  He was the senior officer there on the night of December 28, 2002.  That night was his first ever contact with Mr. Winters.  Officer Helms was on another call when he heard that Officers Brasuell and Walter were directed to check out 7 Lyndhurst Drive in reference to a mentally ill individual.  He arrived

there a few minutes after Brasuell and Walter.  He observed the two officers talking to Mr.

Winters who was on the front porch of the residence.  They tried to talk Mr. Winters into going

home but it was apparent that he was mentally ill and was not going home.  Officer Helms heard

Mr. Winters say that he was there to talk to "Nancy." He would then knock on the door. They

told him he needed to go home and that he could talk to Nancy the next day.  He was further

advised that if he did not go home he would be arrested for criminal trespass.  Officer Helms

gave essentially the same description of the difficulties in getting Mr. Winters into the patrol car

as that given by Officer Brasuell.  But, he also noted that in the struggle Mr. Winters was not

struck by a baton or other object.  He states that Mr. Winters was "not really fighting but more

just resisting the deputies."  He was thrashing and kicking his feet and legs the whole time.

Officer Helms states that as they were taking Mr. Winters to the patrol car he fell face down in

the snow but did not appear to be injured.

    Officer Nelson Walters' account of the arrest tracks closely the statements of Officers

Brasuell and Helms.  He states that when they approached Mr. Winters he asked him "what the

problem was, if he had been drinking and if he had taken any drugs."  Mr. Winters did not

respond to the questions but told them that they were going to be executed.

    After the officers got Mr. Winters in the patrol car, they took him directly to Bates

Medical Center.  On their way there Officer Brasuell contacted the Bentonville Police

Department and requested that an officer be sent to assist.  Bentonville police officers Timothy

Martin and Bryan Hobbs met them at the Bates' Emergency Room and assisted the deputies in

unloading Mr. Winters and taking him to the Emergency Room.

    Mr. Winters had calmed down some until they entered the hospital at which time he

began struggling again.

**(b)**     **First Visit To Bates Medical Center**

After his arrest for criminal trespass, Donald Winters was taken by the deputies directly to the Bates Medical Center in Bentonville "to have him examined and admitted to the psychiatric ward."   Mr. Winters had calmed down some until they entered the hospital whereupon he began struggling again.  He had to be physically placed on a bed and restrained with bed sheets along with handcuffs.  He was examined by Dr. Curtis Wulz who said that he was too violent and aggressive to be admitted to the hospital. (*See* Statement of Deputy Sheriff Brasuell of January 10, 2003, Def.'s Exh. 37).

Officer Bryan Hobbs of the Bentonville Police Department assisted the deputy sheriff in handling Mr. Donald Winters when he arrived at Bates Medical Center on December 28, 2002. In his statement dated April 25, 2003, he advised that the officers had to hold Mr. Winters down when the nurse took his temperature, blood pressure and a blood sample.  He further stated that Mr. Winters was not given any medication while at the emergency room.  He stated that Mr. Winters calmed down and he was able to talk with him briefly.  Mr. Winters stated that he was upset with the Rogers Police Department over the way that they had treated him and that he had filed a lawsuit against them.

Ms. Angel Hoover, a registered nurse in the emergency room at Bates Medical Center on December 28, 2002, was able to take a blood sample from Mr. Winters, get his blood pressure, listen to his chest and abdomen, and ascertain his respiration rate.  Mr. Winters did not complain of pain.  She was in the room when Dr.Wulz came in to examine him.  She stated that Mr. Winters' son called later that morning (December 28, 2002) and advised that Mr. Donald Winters had experienced similar violent episodes in the past but could not recall his father having a history of any serious physical problems.

Mr. Ronald Ralph Summerlin, a licensed practical nurse, was working in the emergency room at Bates when Mr. Winters was brought in.  He stated that Mr. Winters came in around 12:50 a.m. and was released around 2:17 a.m.  He stated that nurse Angel Hoover was able to get him calmed down enough to get his vital signs.  He did not see Dr. Wulz actually examine Mr. Winters.

Mr. Nelson R. Walter, a deputy in the Bella Vista division of the Sheriff's Office was with Deputy Brasuell when they first made contact with Mr. Winters at #7 Lyndhurst Drive.  In his statement (given January 20, 2003) he noted that after his arrest Mr. Winters was taken to the Bates Medical Center ER to be admitted to the psychiatric ward.  Mr. Walters stated that Mr. Winters was examined by Dr. Wulz and released back to the deputy.  He stated that Dr. Wulz agreed that Mr. Winters was a danger to himself and others but stated that the psychiatric ward at Bates was not equipped to handle violent cases like his.  He stated that the  prosecuting attorney's office could be contacted about getting a civil commitment order for Mr. Winters.  However, when the prosecuting attorney's office was contacted it advised that it would be Monday before an Order could be obtained.  Mr. Walter stated that Deputy Brasuell contacted Mr. Darin Winters and requested that he go to the prosecutor's office on Monday to file the necessary paperwork to get a civil commitment order on his father.  Mr. Darin Winters replied that he would be back from St. Louis on Sunday and would go down on Monday to get a commitment order.

The Bates medical record has a hand-written note: "Discharged to police" and the following instruction: "Return anytime if you would like further treatment."  Donald Winters was discharged at 2:17 a.m. on December 28, 2002. There is no indication whether a psychiatric consult was requested.

Mr. Donald Winters was then transported to the Detention Center.

### (c)      Arrival at Benton County Detention Facility

The Benton County Sheriff's Office "Criminal Intake Form" shows that Donald Winters arrived at the jail at 2:30 a.m., December 28, 2002.  The form has the hand-written notation: "Can release to son Darin Winters."  Under "Housing" it states, "to be housed alone." (Plaintiff's Exh. 3).

Deputy Beck states in an "Incident Report," written at 4:00 a.m., that at 2:30 a.m. he received "an assistance call" to which he responded.  When he arrived in the pre-booking area, Mr. Winters had just entered with deputies from the Bella Vista office.  Mr. Winters began walking away.  He was asked to face the wall at which point he fell to the floor, laid on his back and refused to get up.  Mr. Winters was told he needed to be patted down before he could enter the jail.  One deputy tried to pat him down while he was on the floor but was unsuccessful. Finally, three officers held Mr. Winters while the fourth deputy did the pat-down search, after which Donald Winters was placed in holding cell #113.  (Officer Beck's Incident Report, Pl.'s Exh. 4).

When the intake process was completed Deputy Austin went to Mr. Winters' cell and told him he was going to take him into booking and place him in another cell.  Mr. Winters said he liked the cell he was in and that he wanted to be left alone.  Officer Austin told Mr. Winters to stand up.  He refused to leave, wedging himself into a corner of the cell.  Other deputies helped in removing Mr. Winters and in placing him in booking cell #7 for observation.  Mr. Winters was still handcuffed.

At 3:15 a.m, when an officer said he was going to remove the handcuffs, Mr. Winters refused, stating he was used to the cuffs. Force was used to remove the cuffs.

At approximately 6:45 a.m., December 28, Officer Austin entered Mr. Winters' cell and told him that he needed him to come out so he could fingerprint him.  He refused.  As Deputy Austin continued to talk to him Mr. Winters began hitting his forehead on the toilet while screaming "Stop beating me." This was the first instance of such behavior.  Deputy Austin immediately reported this to Sgt. Winters.  By the time Sgt. Winters (no relation to Donald Winters) arrived, Mr. Winters had stopped and was sitting in the corner. At approximately 7:10 a.m. Sgt. Montgomery arrived and was briefed on Mr. Winters' behavior.  While the officers were considering how to get Mr. Winters fingerprinted he once again started beating his head, chin, elbows and shins against the toilet.

Deputy Austin along with Deputies Hook, Shipman and Collins then entered Mr. Winters' cell and told him he was going to be moved to the "Detox cell" where his actions could be monitored by video. Mr. Winters resisted but was forcefully removed and placed in detox.  As the officers left the cell Mr. Winters began to beat himself against the toilet again. Sgt. Montgomery entered the cell and informed Mr. Winters that if he continued he would be restrained for his safety.  The Detox cell is right next to cell #7.  The Court finds no significant record entries before the next morning.

On Sunday, December 29, 2002, at approximately 6:45 p.m. the deputy sheriff forcefully put restraints on Donald Winters so that they could take him before Magistrate Garten for his first judicial appearance after his arrest on criminal trespass charges.  The Court is located within the detention facility.  The hearing was for the purpose of determining probable cause and to consider pre-trial release.  The Court conducted the hearing pursuant to Rule 8.3 of Arkansas Rules of Criminal Procedure.  The Court found that there was sufficient evidence presented to constitute probable cause.  Bond was set at $500 and the defendant was directed to appear in the

District Court of Benton County on January 5, 2003, at 7:30 a.m.  The citation was considered a "must appear" citation.  (See Defendant's Exh. 45).

Donald Winters resisted both going to and coming from the hearing.  Upon his return he was placed back in the Detox cell and the restraints were removed.  There were no significant entries for the remainder of the day of December 29, 2002.  On Monday morning, December 30, 2002, at approximately 7:37 a.m. Mr. Winters was standing on a bench in the Detox cell and exposing himself in front of a window.  When ordered to stop this behavior, he refused and was then placed in a suicide smock.  However, he was able to escape therefrom and continued exposing himself.  At this point he was placed in a restraint chair for 45 minutes.

The following testimony and statements of the Jail Administrator and the deputies who observed Mr. Donald Winters while he was in the Detention Center from December 28 until he was taken to the Court for the civil commitment hearing on December 31, 2002, help complete the picture of Mr. Winters' behavior and the officers responses thereto.

Officer Pelray, Jail Administrator, Benton County Sheriff's Office, manages the jail on a day to day basis. He testified that he took over that job on January 1, 2003.  However, he had served as an assistant for five years before assuming the position of Administrator.  He first saw Donald Winters on Monday, December 30, 2002.  He reviewed Defendant's Exhibit 37 and Plaintiff's Exhibit 1, investigative summaries by the Arkansas State Police and the Prosecuting Attorney, respectively.

When officers saw Donald Winters harming himself Officer Pelray had him removed to the Detox cell where he could be observed with surveillance cameras.  He states that Mr. Winters was seen by the jail medical staff.  He said, "We did all we could."  When asked whether Mr. Winters was continually thrashing about or was calm the reply was, "off and on."  Mostly he

displayed episodic violent behavior until medicated at Ozark Guidance Center on December 31. No staff person beat or hit Mr. Winters.  Rather, staff personnel tried to protect him from himself while trying to carry out their many duties.  No one allowed him to harm himself.  Mr. Winters did not eat and only drank occasionally.

Officer Martinez works the day shift 7:00 a.m. to 4:00 p.m. He saw Donald Winters in a "suicide gown."  On Monday (December 30) at 3:30 p.m. they gave Donald Winters a cup of water.  Page 2 of Plaintiff's Exhibit 11 describes the incident as follows: "And he did take the cup of water and he kept yelling it's acid – it's acid and we kept assuring him it was not acid, and then he stuck his finger in it and tasted it and he – and we said, 'See, it's water.'  And he goes, 'This is slow burning acid,' and we just turned around and walked away you know. . . This would be Monday."  (December 30).

The statement of Deputy Crabtree describes the scene at 7:30 a.m. on December 30 (Monday): "Inmate Winters was in detox and had stripped his anti-suicide smock off.  He stood upon the bench and began playing with his genitals in front of the females and everyone else in booking.  Sgt. Carter told him to stop, get down, and put his clothes back on.  He refused. Deputy Hook and I went into detox and placed him on the floor.  We put the smock on him and placed him in waist and leg restraints.  We exited the cell with no further incidents."  (Deputy Crabtree's statement, Plaintiff's Exh. 12).

The Statement of Deputy Hook describes the scene at 9:15 a.m., December 30 (Monday): "Sgt. Carter informed me that inmate Winters . . . needed to be put in the restraint chair for his own safety.  Sgt. Carter and I placed inmate Winters in the restraint chair at 9:15. After inmate Winters calmed down, Deputy Stewart and I removed inmate Winters from the restraint chair at 10:01.  I returned to my duties."  (Deputy Hook's Statement, Plaintiff's Exh. 13).

The Statement of Deputy Bruce Center, who worked the night shift from 11:00 p.m. to 9:00 a.m. His first contact with Donald Winters was on Monday morning (December 30) around 3:00 a.m.: "He was in the nurses station in the holding cell and he was naked the whole time. And probably about 3:00 a.m. . . they had me go in there and another deputy (Bailey) and put his – try – whenever you'd go in there he'd just . . . jump up on the bunk and . . . clamp down. Well we went in there and put his pants on him and then he took them off and so we put them on again and he took them off."

"Yeah. . . that's all we did you know, we tried to get him clothes because that was the first night I think he started getting naked ever . . . you know he wouldn't keep his clothes on. So Monday morning (December 30) we knew we had nurses call, everything else going on so we went in and put a smock on him and took . . . that's when we took him to detox."  ". . .You'd go in there and he'd say you're going to –  you know like when we'd go and put his pants on he'd say get that gun out of my head – quit pouring acid on me."  (Deputy Center's Statement, Plaintiff's  Exh. 14).

When asked if he ever had a normal conversation with Mr. Winters, Officer Center stated: "No – never like me and you are talking – I mean but he understood because he knew me. You know every time I'd come in he'd call me the fat, bald Nazi . . . and he knew all the officers – that's why I thought it was weird you know he talked so crazy but he knew all of us."

Deputy Center's Statement continues:  "Monday night when we came in he was talking a little bit but he stood – there's a grate – the drain grate.  I noticed he was up all night . . . around 2:30 a.m. I noticed I couldn't see him any more.  So I walked over there and he was standing on that grate – just standing there naked – and he stood that way until . . . 7:00 a.m. – never moved . . . he never moved from that grate for about 5 hours.  He was talking a little bit, just mumbling

..."   "[A]fter the day shift got there around 7:00 a.m. he started getting upon the bench . . . and we'd take him down . . . and he'd get right back up there so we'd go back in and take him down. We did that 4 or 5 times and finally I called the Sgt. and said . . . this guy is getting up on the bench, is there anything you want us to do? I guess after the Lt. and the Captain talked about it they said no, just – you know quit – quit going in there and getting him off the bench.   So he just stood up on the bench the rest of the time I was here until 9:00 a.m." (*Id.*).

Darin Winters returned from St. Louis and attempted to visit his father on December 29 and the morning of December 30, but the officers could not coax Mr. Winters out of his cell for Darin to visit him.  However, at around 2:30 p.m. that afternoon (Monday, December 30) Captain Drake authorized Darin to see his father.  Once again there was an effort to entice him out of the cell but Mr. Winters said that the room was "an acid bath."  Darin came to the booking area and after a while was able to approach his father.  He was able to get his father to drink three or four cups of water.  After drinking the last cup Donald Winters grabbed his right side and said "That was the acid."

On Monday, December 30, 2002, Darin Winters went to the prosecuting attorney's office to sign a petition for involuntary commitment.  Deputy Prosecuting Attorney Candance Taylor assisted him with the necessary paperwork.  Defendant's  Exh. 3 is a copy of the petition.  The Arkansas Statutes controlling involuntary civil commitment found at §20-47-201, et seq.[3]

---

[3] It is important to understand the Arkansas law being followed in Mr. Donald Winters case. Ark. Code § 20-47-205 grants exclusive jurisdiction to the circuit courts of the state with respect to involuntary commitment.  Section 20-47-205(b)(1) states:

Within seven days of the person's detention, excluding weekends and holidays, the court shall conduct the hearing as defined in § 20-47-214.

Section 20-47-207 deals with the involuntary admission petition.  Section 20-47-207(c) sets forth the involuntary admission criteria:

(c) Involuntary Admission Criteria.  A person shall be eligible for involuntary admission if he or she is in such a mental condition as a result of mental illness, disease, or disorder that he or she poses a clear and present danger to himself or herself or others:

(1) As used in this subsection, "a clear and present danger to himself or herself" is established by demonstrating that:

(A) The person has inflicted serious bodily injury on himself or herself or has attempted suicide or serious self-injury, and there is a reasonable probability that the conduct will be repeated if admission is not ordered;

(B) The person has threatened to inflict serious bodily injury on himself or herself, and there is a reasonable probability that the conduct will occur if admission is not ordered; or

(C) The person's recent behavior or behavior history demonstrates that he or she so lacks the capacity to care for his or her own welfare that there is a reasonable probability of death, serious bodily injury, or serious physical or mental debilitation if admission is not ordered; and

(2) As used in this subsection, "a clear and present danger to others" is established by demonstrating that the person has inflicted, attempted to inflict, or threatened to inflict serious bodily harm on another, and there is a reasonable probability that the conduct will occur if admission is not ordered.

Section 20-47-209 deals with the "Initial Hearing", and subsection (a) reads as follows:

(a) If the person named in the original petition is not confined at the time that the petition is filed, the court may:

(1) Enter an ex parte order directing a law enforcement officer to serve the person with a copy of the petition together with a notice to appear for an initial hearing.  The hearing shall be set by the court within three (3) days, excluding weekends and holidays, of the filing of the original petition.  If the person is duly served and fails to appear, the court shall issue an order of detention; or

(2) Dismiss the petition.

Section 20-47-209(c)(3) states:

If such a determination is made, the person shall be admitted for evaluation, and a hearing pursuant to § 20-47-214 shall beheld within the period specified in § 20-47-205. [i.e. within 7 days excluding weekends and holidays.]

Section 20-47-210 is captioned "Immediately Confining Dangerous Persons", and subsection (a)(2) states:

> (a)(2) Any person filing a petition for involuntary admission may append to the petition a request for immediate confinement which shall state with particularity facts personally known to the affiant which establish reasonable cause to believe that the person sought to be involuntarily admitted is in imminent danger of death or serious bodily harm or that the lives of others are in imminent danger of death or serious bodily harm due to the mental state of the person sought to be involuntarily admitted.

Section 20-47-210 then goes on to provide that if the request for immediate confinement is appended to the petition the Court will not only determine whether there is reasonable cause to believe that the person meets the criteria for involuntary admission but also will determine if the person is "in imminent danger" as described above.

The Court notes that the petition filed by Darin Winters did not have attached thereto a "request for immediate confinement." This cannot be explained by the circumstance that Donald Winters was then in custody because the assumption was that he would forthwith be turned over to the "Arkansas Mental Health System" via Ozark Guidance Center. The failure to attack such a request may reflect a lack of immediate concern or belief that Donald Winters met the criteria for immediate confinement.

Section 20-47-210(b)(3)-(c) then goes on to state:

> (b)(3) If the probate judge determines that immediate confinement is necessary to prevent death or serious bodily harm to either the person sought to be involuntarily admitted or to others, the judge shall order the law enforcement agency that exercises jurisdiction at the site where the individual is physically present to transport the individual to an appropriate receiving facility. A hearing, as provided for in § 20-47-209(a)(1), shall be held within seventy-two (72) hours of the person's detention and confinement.

> (c) If the person is transported to a hospital or to a receiving facility or program or to the office of a licensed physician of the State of Arkansas or of the federal government, either salaried or self-employed, for purposes of initial evaluation and treatment, then the hospital or receiving facility or program or physician may detain th e person for initial evaluation and treatment provided.

> (1) The person is immediately advised of his or her rights as provided in § 20-47-211; and,

> (2) The person is determined by the treatment staff of the hospital or receiving facility or program or by the physician to be of danger to himself or herself or others as defined in §20-47-207; and

> (3) A hearing pursuant to § 20-47-209(a)(1) is held within the specified time period.

Section 20-47-213, entitled "Initial evaluation; detainment" provides in pertinent part:

> (a) If the person is transported to a hospital or receiving facility or program or to

- 21 -

the office of a licensed physician of the State of Arkansas or of the federal
government, either salaried or self-employed, for purposes of initial evaluation
and treatment, then the hospital or receiving facility or program or physician may
detain the person for initial evaluation and treatment, provided:

>    (1) The person is immediately advised of his or her rights as provided in §
>    20-47-211;
>    (2) The person is determined by the treatment staff of the hospital or
>    receiving facility or program or by the physician to be of danger to himself
>    or herself or others as defined in § 20-47-207; and
>    (3) A hearing pursuant to § 20-47-209(a)(1) of this subchapter is held
>    within the specified time period.

(b)(1) If a physician is not immediately available for the initial evaluation, the
initial evaluation may be performed by an administrator's designee, working
under medical supervision and direction.  In such cases, a supervising physician
shall be consulted by telephone before any decision is made concerning the initial
evaluation and treatment.

>    (2) Every person admitted to a hospital or a receiving facility or program
>    under this provision shall be seen and evaluated personally by a physician
>    within twenty-four (24) hours of detention.

(c) In all cases, the evaluations required by the court for involuntary admission
pursuant to  § 20-47-214 shall be performed only by a physician licensed to
practice in the State of Arkansas.

(d) If it is determined at the initial hearing that the person should be evaluated to
determine the need for mental health services on an involuntary basis, a law enforcement
officer or family of the person, as the court shall direct, shall transport the person to the
place of evaluation.

Finally, the Court notes the provisions of § 20-47-214, "Involuntary admission; public
hearing."  That section provides that within the period specified in  § 20-47-205 (that is within
seven days of a person's detention excluding weekends and holidays) a hearing must be
conducted in public with all testimony taken under oath and preserved.  At this hearing the court
is required to make a determination whether the person sought to be involuntarily admitted is a
danger to himself or herself or to others as defined in § 20-47-207.  20-47-214(b)(3) states, "If
this burden of proof has been met, the court shall issue an order authorizing the hospital or
receiving facility or program to detain the person for treatment for a maximum of 45 days."

Section 20-47-218 deals with "Limitations on treatment", and provides, *inter alia*, that
detention under this sub-chapter may only be in a "hospital or a receiving facility or program as
defined in Section 20-47-202." Section 20-47-218(c) provides:

>    If the court at a forty-five-day admission period or a one hundred eighty-day
>    involuntary admission hearing finds by clear and convincing evidence that the
>    person is in need of treatment, it shall issue an order involuntarily admitting the
>    person to the custody of the administrator or his or her designee for care and
>    treatment within a receiving facility or program which is located within the

Donald Winters fought being transported to the Court for the involuntary commitment hearing on December 31, 2002.  He had to be physically restrained and carried to the transport vehicle and then into the courthouse.

### (d)   Civil Commitment Hearing

The civil commitment hearing took place on Tuesday, December 31, 2002.  Two deputies had to forcefully bring in Mr. Donald Winters who was cuffed and shackled.  Mr. Donald Winters stated that he was about to be executed.  The deputies were assisted by a police department officer, Mr. Scott Parks.  The hearing began at 1:00 p.m. before Judge Scott.  Judge Scott had to have Mr. Donald Winters removed from the courtroom because of his behavior. Officer Brasuell testified about the circumstances surrounding the arrest of Donald Winters around 12:30 a.m. on Saturday, December 28.  He was asked to describe Mr. Winters demeanor. Officer Brasuell described Mr. Winters' conduct and the difficulty they had in controlling him. He also advised the Court that they first took Mr. Winters to the Bates Medical Center, "knowing they had a psychiatric unit."  Officer Brasuell stated: "During that time I wasn't in the examination room a whole lot.  I was speaking to the Dr. about getting him committed that night or, a seventy-two hour holding period for the psychiatric unit there.  But he (Donald Winters) did speak a lot about the lawsuit and again constantly repeating that we were going to be executed." (County Defendant's  Exh. 47).

Near the end of the commitment hearing the following colloquy occurred:

THE COURT: However I am going to commit him to the Arkansas State Mental Health System.  It's the finding of this Court that Mr. Winter's behavior demonstrates that he so lacks the capacity to care for his own welfare that there's

---

person's geographic area of residence or to an appropriate hospital as defined in § 20-47-202.

a reasonable probability of his death, serious bodily injury, or serious physical or mental debilitation if his admission is not ordered.

Ms. Taylor, did you bring an order?

MS. TAYLOR: I did, your Honor.  If I may have Mr. Parks' signature obtained.

MR. WINTERS: Your Honor, may I say something, please?

THE COURT: Yes.

MR. WINTERS: Just for the record, ma'am, my name is Darin Winters.  I'm Donald's son.  I would just like to say this.  If it's possible, I would like to keep my father in a northwest Arkansas facility rather than Little Rock, where it's a great distance to travel to see him; and I don't know if it's going to be for seven days on his first committal or what, but I just have to figure if he's discharged after a week, or after several weeks, it's not going to get much better at all; and I would just ask the Court, your Honor, to take that into account and to do what we need to do to get the help that my father deserves and really needs and just keep him within the system absolutely as long as possible.  That's about all I have.

THE COURT: Mr. Winters, I appreciate that.  There is no facility in northwest Arkansas that is built or designed to hold your father at this time.  He'll have to go to the State Hospital in Little Rock and, depending on what the assessment is there and his treatment, he may or may not have a seven day hearing within a week, but you can stay in touch with Ms. Taylor and she can keep you apprized of what's going on down there.

(County Defendant's  Exh. 47).

The Court thereupon entered the Commitment Order the important portions of which read

as follows:

> That there is probable cause to believe that the Respondent has a mental illness, disease, or disorder, and by reason thereof, the Respondent poses a clear and present danger to himself or others.
>
> That the Respondent should be, and is hereby involuntarily admitted to the Arkansas Mental Health System for a period of seven (7) days for evaluation to determine whether treatment for mental illness is appropriate.  If, Ozark Guidance Center, the designated receiving facility, determines that the Respondent requires hospitalization and there is no state mental health detention facility that can provide 24-hour inpatient care within the physical jurisdiction of this Court, then such inpatient treatment

shall be provided at the Arkansas State Hospital, 4314 West
Markham, Little Rock, Arkansas, for a period of seven (7) days, for
evaluation to determine whether treatment for mental illness is
appropriate.  Nothing shall prevent the Respondent from being
released sooner if, in the judgment of the treating physician, at
either the Ozark Guidance Center or the Arkansas State Hospital,
the Respondent does not require further mental health treatment.
The Court shall be immediately advised of such release and
dismiss the Petition pursuant to A.C.A. 20-47-213.

If determined that Respondent needs the services of Ozark
Guidance Center and a Section 9 Hearing on this matter is
necessary, it shall be scheduled on or before the 6th day of January,
2003, at 1:30 p.m. before the Probate Judge pursuant to Act 861 of
1989, at which time a treatment plan as defined in Act 861 of 1989,
will be submitted to the Court.  In the event the Respondent is in
Little Rock, then the hearing time and date shall be set by the
presiding judge.

(Commitment Order, Defendant's  Exh. 4).

Darin Winters testified that when his father was hospitalized at Highland Hall in 2000 he

was often forcefully medicated.  He continued to get better until he left that institution.  Highland

Hall had released Donald Winters into the custody of Mr. Darin Winters and it was Darin's hope

that a similar procedure would be followed on this occasion.

Immediately after the entry of the civil commitment order, Mr. Donald Winters was

transferred to Ozark Guidance Center "the designated receiving facility," as directed in the

Commitment Order.

### (e)    Ozark Guidance Center

At Ozark Guidance Center, Donald Winters was observed for about two hours and, to a

limited degree, examined by psychiatric nurse Beth Meltzer, clinic social worker Jeanie Jenkins

and Dr. Lance Foster.  All three reported that Mr. Winters was uncooperative with all aspects of

their examinations.

Ms. Jenkins was interviewed in March 2003.  She stated that during the entire time

Donald Winters was at Ozark he acted as if he were speaking into an invisible recorder noting everything that was going on.  She stated that she called the Arkansas State Hospital in Little Rock and was told that there were no beds available, but that Mr. Winters would be placed on the waiting list.  She states that she also called Living Hope and left a message to have them contact Nurse Meltzer.  And, she advised Darin Winters that she had attempted to find a bed for his father but that all facilities were full.

Dr. Foster's notes expressed his opinion that Mr. Winters was "a clear and present danger" because of his condition.  After his examination of Mr. Winters, Dr. Foster caused two drugs (Ativan and Geodone) to be administered by injection into his left and right buttocks while Mr. Winters was restrained by the deputies.  This apparently was done just before Ozark turned Mr. Winters back over to the deputies to transfer him back to the Detention Facility.  Dr. Foster also called Dr. Mullins, the jail physician, to advise that Mr. Winters appeared severely dehydrated.

According to the deputies, Mr. Winters calmed down and fell asleep on his way back to jail.  The deputies carried him back to the detox cell and removed his restraints without incident.

The Ozark Guidance Center's records show that Mr. Winters was there from around 3:10 p.m. until 5:00 p.m. on December 31, 2002.  Under "legal status" is found: "Court Order dated 12/31/02."  Under "Type" is the entry "7-day."  The legal charge of "criminal trespass," a "misdemeanor," is noted. Under "Prior Inpatient Psychiatric Treatment" is found "Highland Hall, Springdale, AR 12/07/00 to 12/28/00 at NWMC" (Northwest Medical Center).  Under "signs of severe stress" is found "blood pressure normal, dehydrated, refuses food and fluids, electrolytes and potassium level [cannot decipher]. . ."  The records also state that Mr. Winters "refused all medication" and showed blood pressure as 150/90 and pulse 90.  There is a printed inquiry which

states, "If the person is not admitted to treatment NOW, is there a reasonable probability of ☐

death or ☐ serious bodily injury."  Both were checked indicating the affirmative.  The following

explanation for those answers is given: "Client is seriously mentally ill – acutely psychotic –

unable to function in society – no family can care for him," and there is the note: "According to

son, client was employed last week and doing fairly well.  He's become acutely psychotic

(paranoid)."  The "Screener's Recommendation" reflects the following entry "psychiatric

hospitalization."  Another entry states that there were "no physical medical problems known" and

that the "type of treatment received" was "haldol injection 1 – 50 mg."  (Plaintiff's  Exh. 16).

The form, "Additional Information" has the following entry: "Client to return to Benton

County Jail to await placement at Arkansas State Hospital (ASH).  Single Point of Entry done

and faxed to ASH.  No charitable care male bed available at any facility that accepts mental

health commitments at the present time."

The "General Notes" section (prepared by Ms. Jenkins) reads: "After two hours and

uncountable attempts to calm client, injection given per Dr. Order, with hope that client may

calm enough to at minimum allow a physical assessment and treatment of his obvious physical

distress.  Extreme concern over his dehydration and metabolic status.  Geodone 10 mg. Given IM

in LGM and Ativan 2 mg. Given IM in RGM using aseptic technique . . . Deputies restrained

client while injection was given.  Samples of Zyprexa Zydia given to deputies with instructions

to give 10 mg. sub ling.  Daily.  Enc. Them to call Ozark Guidance Center with problems,

questions or concerns.  Understanding voiced.  Client escorted out of Ozark Guidance Center,

continuing to talk non-stop and refusing to cooperatively ambulate . . ."

The last entry by Ms. Jenkins in the "General Notes"section states: "Completed SPOE

[Single Point of Entry form] which was faxed to ASH.  There were no beds available and client

was placed on waiting list.  Attempted to contact Living Hope for placement and left message for

admissions coordinator to contact this social worker and/or Director of Emergency Services,

Beth Meltzer.  See SPOE same date."  (Pl.'s  Exh. 17).

      The last record in evidence from Ozark Guidance Center is Plaintiff's Exhibit 18 which,

in three pages, gives Dr. Lance Foster's "Progress Note, Subjective/Objective," his

"Assessment," and an "Addendum" (under "General Notes").  The entire exhibit is quoted as

follows:

> Mr. Winters is a 59-year-old white male referred from Benton County Jail for
> commitment evaluation and Single Point Entry.  He is seen along with Beth
> Meyers, RN. For evaluation.  Mr. Winters presents with significant concerns of
> threats to his life.  He states that Rogers Police Department, as well as Wal-Mart,
> is trying to kill him.  He believes that Ozark Guidance is also trying to kill him
> related to lawsuits pending in Federal Court.  He states that if we continue the
> evaluation and our "plans," that it will ruin our careers.  He believes that there is a
> microphone in the room recording.  He states that he feels we are trying to poison
> him.  The deputies bringing Mr. Winters in state that he has not had any fluids for
> three days and he will refuse any types of fluids, but does seem to be eating.  He
> denies any sleep disturbance, though they state that they observed he has had
> somewhat disturbed sleep.  He states that he believes that we will put a
> "chemical" on his face and that this will kill him.  He believes that any type of
> water that we bring into the room is "acid."  During evaluation of his blood
> pressure, he believes the nurse is injecting something into his arm.  He has similar
> concerns as she takes his pulse.  He is quite angry and belligerent, swearing often
> throughout the interview.  He is hostile and demeaning toward staff as well as the
> deputies.  He has significant abrasions on both ankles and purple discoloration of
> his toes and the bottoms of his feet.  He also has a cut on his head, though it is
> difficult to get a clear look at this because he is refusing to be seen and
> approached.  The nurse, however is able to get a clear look at noted small
> laceration on his head, left side/central.  He is notably very dry with chapped lips
> and dried spittle.
>
> Overall, he is quite paranoid and delusional.  He currently denies any thoughts of
> self harm.  He does not threatened (sic) others with self harm while I am in the
> room, though does make multiple litigation threats toward staff here as well as the
> deputies.  He strongly believes that he is being targeted for murder.  He states that
> he has inner peace and does not have any "negative feelings."  He tells me that he
> is in the "gap" stating that this is the space between people's racing thoughts
> through the day that allows him to be at peace.  He overall has poor grooming and
> hygiene.  He has intense eye contact, poor impulse control, is redirectable with

some degree of effort.  He has a normal level of psychomotor activity.  There are no noted tics or tremors.  No evidence of EPS or tardive dyskinesia.  Speech is significantly pressured with increased volume at times, moderately increased rate, normal tone.  Affect is paranoid and anxious and quite angry with quite limited range.  He does appear to be in a very agitated state.  He is quite paranoid and delusional.  He denies any auditory, visual, tactile hallucinations.  He denies any suicidal ideation.  He denies any homicidal ideation.  Intelligence is judged to be above average to clinical assessment. Insight is very poor.

ASSESSMENT: Mr. Winter's current state appears to be very similar to when he was hospitalized approximately two years ago at Northwest Medical Center where he spent approximately three weeks on the inpatient unit.  At that time, he was very delusional and agitated and fearful of being killed.  He eventually was stabilized to the point of presenting no clear and present danger and was discharged to follow up with a guarded prognosis due to his anticipated poor compliance with treatment.  He appears to be appropriate for diagnosis at this time, of Delusional Disorder, Paranoid Type.

PLAN: Related to his significant problems with paranoia and his delusions of being targeted by law enforcement as well as the medical community, I strongly believe he represents clear and present danger to himself in his inability to care for himself to make concrete decisions, his refusal to take in fluid is of great concern, as are his wounds which also appear to be related to his paranoia and battling with his restraints and the officers attempting to assist him.  Many concerns of metabolic imbalance related to dehydration and his increased risk factors for heart attack and stroke make treatment emergent at this time.  He will be given injectable medications on emergency basis: Geodon, 20mg IM and Ativan, 2mg IM.  Also, I strongly recommend that he be evaluated medically in the emergency room related to his dehydrated state.  Current blood pressure is 140/90.  Pulse is 90.  This is taken during his very agitated state.  We were not able to perform orthostatics.  I will also discussed (sic) this further with Dr. Mullins of the Benton Country (sic) Jail.  I also prescribed Zyprexa Zydis to be given 10 mg. q. Day.  The Deputies are given samples to this medicine.

Lance C. Foster, M.D.
Staff Psychiatrist


L.C. Foster, M.D.
Authenticated Electronic Signature
01/02/2003 16:14

Addendum: I spoke with Dr. Mullins by phone after Mr. Winters was seen in the clinic.  We discussed our evaluation and the treatment done here including medications used for emergency treatment.  I described to Dr. Mullins my concerns over Mr. Winters' current medical and psychiatric condition and my

opinion that he needed to be seen in the emergency room today rather than evaluated medically in the future.  Dr. Mullins also expressed concern and stated that he would contact the deputies and instruct them to have him seen in th ER.

L.C. Foster, M.D.
Authenticated Electronic Signature
Date Locked: 01/02/2003

(Plaintiff's Exh. 18).

The deputies took Mr. Winters back to jail as directed by Ozark Guidance Center.  They noted that Mr. Winters calmed down and fell asleep on the way back to the jail.  The deputies carried him to the detox cell and removed his restraints without incident.

Since Ozark Guidance Center completed its work at about 5:00 p.m. on December 31, 2002, it is assumed that Mr. Winters was back in the jail by 5:30 p.m.

### (f)     Second Visit to Bates Medical Center & Examination by Dr. Diadone

After Dr. Mullins, the jail physician, received Dr. Foster's call advising that Mr. Winters was severely dehydrated, Dr. Mullins promptly directed that Mr. Winters be taken to the Emergency Room at Bates Medical Center to be checked for dehydration. Deputies Scourers and Turner placed restraints on Mr. Winters without incident and transported him to Bates Medical Center Emergency Room without resistance.  They arrived at Bates around 6:00 p.m.  Because of the medication that had been administered to Mr. Winters earlier at Ozark Guidance Center, the Bates staff was able to examine him without incident.

At Bates, Mr. Winters was seen by Nurses Paula Basse and Gail Swisher and Dr. Paul Diadone.  By agreement of the parties, Dr. Diadone's testimony was taken by phone, he being at a remote site.  The Court has reviewed his testimony carefully noting that he was the last physician to see Mr. Winters before his death.

### (1)     Testimony of Dr. Paul Diadone

Dr. Diadone was working at the Emergency Room at Bates Medical Center on the evening of December 31, 2002 when the deputies brought in Donald Winters.

Dr. Diadone graduated from Rutgers Medical School in 1996 and did a residency in internal medicine in New Jersey.  He moved to Bentonville, Arkansas, in 2001 and opened an internal medicine practice.

Dr. Diadone was standing at the nurses station when the two officers brought Mr. Winters in.  Mr. Winters was not combative.  He was handcuffed and shackled and very sedate.  He was placed in a wheelchair and moved to examination room number two.

Dr. Diadone was informed that Dr. Mullins, the Benton County Detention Facility's doctor, instructed the officers to bring Mr. Winters to Bates Medical Center because of his dehydration.  Dr. Diadone did not have a direct conversation with Dr. Mullins.  The officers also told Dr. Diadone that Mr. Winters had been combative over the previous two days and that they had taken him to Ozark Guidance Center earlier that day where he had been administered "some medications."  The officers told him that Mr. Winters had been drinking some fluids but was apparently dehydrated.

According to Dr. Diadone, Mr. Winters did not respond very well to physical or verbal stimuli and was not able to carry on a meaningful conversation.  He could not get a history.  He was able, however, to perform a physical examination, checking Mr. Winter's "eyes, pulse rate, expirations, did a tongue depression . . . did an external chest rub, listened to his heart and lungs and examined his abdomen, which was soft . . . membranes in mouth were dry and he appeared

to be mildly dehydrated."[4]  Mr. Winters temperature was 100 degrees.  There was nothing indicating peritonitis.

Dr. Diadone was aware that Mr. Winters had been at Bates on December 28th and that his blood sugar was elevated. He ordered two liters of normal saline solution and ordered glucose to be added to the I.V.  He stated that Mr. Winters did not present symptoms of severe clinical dehydration, only mild dehydration.  He noticed a small abrasion above the left eye which was not serious enough to require sutures.

Dr. Diadone called Ozark Guidance Center to obtain the itemization of the medications prescribed at Ozark for Mr. Winters.  He was told that Ozark ordered injections of Geodon and also Ativan.   He also reviewed Mr. Winters' earlier chart which he found in the emergency room.

Dr. Diadone conducted a physical examination of Mr. Winters while Mr. Winters was on a stretcher.  He found his pupils to be equal and round; his heart regular; his lungs clear; his abdomen soft; many bruises; and that he moved his extremities normally.  Dr. Diadone had blood work done which turned out to be essentially normal.  He stated that the mucus membranes were not bad, and that there was no significant dehydration.  He felt that the two liters of fluids were sufficient.  Nevertheless, he told the deputies that if Mr. Winters did not eat or drink for the next twelve to sixteen hours, he might need further hydration.

Before discharging Mr. Winters, Dr. Diadone did a second physical examination and found him to be more responsive at that time.   He worked closely with Mr. Winters and observed him for over one and one-half hours.

---

[4]  The Court does not have a trial transcript.  When quotations are used in connection with Dr. Diadone's testimony, they reflect the Court's handwritten notes taken as the witness testified.

In sum, Dr. Diadone found that there was no indication that Mr. Winters was suffering from any serious medical problem and concluded that he was "stable" upon discharge.

Dr. Diadone mentioned that Bates Medical Center was not equipped or staffed to handle or deal with acutely psychotic patients.  Bates relies upon the Ozark Guidance Center and the Arkansas State Hospital to provide any needed psychiatric treatment.  If an emergency room patient presented in need of such of psychiatric treatment, Dr. Diadone would ordinarily call Ozark.  However, in this instance he knew that Mr. Winters had first been seen by the staff at Ozark.

Before discharging Mr. Winters, Dr. Diadone reviewed the blood sugar, found it lower, improved and concluded the blood work was normal.

When asked what would be the symptoms of peritonitis, Dr. Diadone mentioned distension of the abdomen which should be hard and rigid with rebound pain, fever and discoloration.  Normally of course, the examining doctor relies heavily upon the patient's complaints which were not available here.  But, he did observe that peritonitis "is not subtle."

One of Plaintiff's witnesses, Dr. Larry Miller, took issue with Dr. Diadone's finding that Donald Winters was "stable" upon discharge on the evening of December 31, 2002.

He reviewed the medical records and concluded that Winters' blood sugar and other readings called out for further tests.  But, this is not a malpractice case.  None of the doctors or medical personnel who dealt with Donald Winters are parties to this lawsuit.  The Defendant Sheriff and his deputies had no choice but to accept the professional decisions of the medical staffs and to follow their directions.

### (g)    Return to Benton County Detention Center

The information for this section comes from Plaintiff's exhibits which contain the

statements of officers taken during the investigation into the death of Donald Winters and from the trial testimony of Officer Pelray.

### (1)        Officer Pelray's Testimony

By 4:30 a.m., January 1, 2003 the medication given Mr. Winters at Ozark had worn off. Deputies tried to get Mr. Winters to take the medicine prescribed at Ozark but he refused to take it.  Nothing unusual was noted until 7:40 a.m. at which time Mr. Winters was seen lying on his back waving arms in the air and talking to himself.  Between 8:00 a.m. and 10:00 a.m. he was observed lying on the mat in the middle of cell sleeping.  At 12:30 p.m. a sheet was put over one window (but the video was clear).  Officer Pelray investigated after Mr. Winters death to see if anything could have been done that was not done.  He found nothing and concluded that the acts of Sheriff's Office personnel were proper and consistent with Sheriff's Office policies.

### (2)        Officer Paul Martinez's Statement

Officer Martinez saw Mr. Winters on January 1, 2003.  He statement reads:

I saw him this morning ah when we came in from briefing to swap out the shifts about 8:00 o'clock. He was laying in the - detox where the camera was on him.  He was laying on the mat -- he was like half way on the mat --- half off -- half, on.  And I saw him later on about – somewhere close to 10:00 and he was on the mat then.  He moved all the way on the mat and he was in his stripes.  He was wearing his clothes then.  He was – he was out. I mean he was out.  I guess they'd given him shots somewhere where he was out completely.

(Martinez Statement, Pl.'s Exh. 11).

Officer Martinez fed the inmates starting at 10:30 a.m.  He looked in Donald Winters cell. As Officer Martinez described:  "No I didn't open the door – I just looked inside and he was still sleeping on the mat . . . he didn't eat – we didn't feed him.  At least, I didn't feed him – he was – he was out."  (*Id*.)

Officer Martinez's statement continues detailing event occurring around 2:30 p.m.:

> I was coming back from lunch . . . and Deputy Switzer (who was in Central Control) had
> said over the speaker as I was going down the hallway that I go check . . . [because] he
> says he thinks that Mr. Winters might have fallen.  So I walked down to detox and went
> in and I – I observed him through the – through the door and he was – he was naked and
> he was leaning over – he was ah on his knees with his head down with his rear up in the
> air.  And I stood there and I observed him ah he was breathing . . . he seemed to be
> alright.  Ah – I tapped on the door . . . he didn't move -- he just -- just stayed there in the
> position breathing and ah then went about my other duties . . . cause . . . we had a whole
> bunch of inmates coming in from Pulaski County and so we were busy taking care of that.

(*Id.*)

When asked if he told anybody, Officer Martinez replied:

> No -- well I know he was getting poop and all that all over the walls and
> everything.  Yeah, I did tell whoever was at the counter – I said ah he's messed
> that whole cell up . . . crap all over the walls.  He smudged it -- he's smearing it --
> he had smeared it all over the walls.  That's as far as it went and ah I went about
> my other duties . . . that was the last time that I ah – I observed anything on him.

(Martinez Statement, Plaintiff's Exh. 11).

### (3)   Deputy Bruce Center's Statement

Officer Bruce Center stated:

> And then I was Intake Tuesday [Dec. 31] . . . so whenever I came in Tuesday night he was
> asleep and that's the first time I've seen him sleep. . . . He slept all night long.  I checked
> on him. . . . They just said he went to OGC [Ozark Guidance Center] and they gave him
> some shots today . . . and they said he'd been asleep ever since.
> . . .
> No I was here this morning and I think the reason why they called me in was because I
> tried to give him his meds this morning.

(Plaintiff's Exh. 14).

### (4)   Officer Toby Shane's Statement

Officer Shane worked evenings from 3:00 p.m. to 1:00 a.m.  He stated that he had no real

contact with Donald Winters, but, "I looked in . . . on him 3:30 [p.m. January 1, 2003] and he

was still sitting up."  Mr. Winters was "[s]itting on the mat in the middle of the floor . . . toward

the bench yeah.  He had no clothes on –   he was naked."

When asked what he did after 3:30 p.m. on January 1, 2003, Officer Shane responded:

Besides when Deputy Yates told Sgt. See you know there might have been something wrong with Winters – I went in there and he looked you know – looked like something was wrong.  And ah so they cleared the waiting area you know there he was.  So I took his pulse and everything. . . . He was laying on his right side. . . .

. . .

Checked the carotid – had no pulse didn't find any. [I] turned him over and felt his left arm in the process – I mean his right arm . . . Turned him over – lower arm is cool . . . like the core temp and the upper arm was his body temp – was still warm to touch.  And that was when I started to do some chest compressions so in case some – something could actually go with it and happen from there.

(*Id.*)

When asked the time this took place,  Officer Shane said:  "I know when I did the chest compressions when Deputy [inaudible] was in there with me – his watch said . . . twenty-two after, after 4:00 p.m."  When questioned regarding who was in the detox cell with him, Officer Shane replied:

I think Gage – See and I all went there and checked him. . . . I did like fifteen and then asked for a mask you know . . . and then asked for a mask . . . two or three sets of 15 before they got one there. . . . After Gage and See left and I went back in to do chest compressions ah Reynolds came in to help. . . . Yeah, Gage was — was the one that opened the door and found him.

(Officer Shane's Statement, Plaintiff's  Exh. 14).

### (5)      Sheriff Keith Ferguson's Testimony

Sheriff Keith Ferguson of Benton County, Arkansas, in his official capacity is one of the two remaining Defendants in this case.  He testified that he was elected Sheriff in November of 2002 and took office on January 1, 2003.  Before becoming sheriff he served thirty-two years with the Arkansas State Police.  He had been in office less than six hours by the time Mr. Donald Winters died.  However, the out-going sheriff invited him in so that he could get involved before he actually took office.  In fact, he did see Donald Winters in the Detention Center.  He had

difficulty in dealing with Mr. Winters' son, Darin Winters.  He arranged for Darin to visit his father while in custody and requested Darin to take his father home.  Darin refused, stating that it would be impossible to handle his father at home. Sheriff Ferguson was aware that Darin, during the jail visit with his father, was able to get him to drink water which Donald Winters immediately described as "acid."

Overall Sheriff Ferguson described Donald Winters as being like a "mad bull" on occasions, aggressive and agitated but then, on other occasions, subdued and calm.

According to Sheriff Ferguson the Sheriff's Office first became aware of Mr. Donald Winters when a neighbor of Mr. Winters called the Sheriff's Bella Vista Office to complain that Donald Winters was banging on his door.  It turns out that that same neighbor called Darin Winters in St. Louis with the same complaint.  And then Darin called the Sheriff's Office to advise about his father's condition and to request his arrest.

Sheriff Ferguson pointed out that when the deputies arrested Donald Winters they took him not to the jail, but to Bates Medical Center to have him admitted there.  The Sheriff does not know if the medical personal at Bates contacted Ozark for a psychiatric consult.

Although the Sheriff has had many problems with psychotic inmates he acknowledged that very few of them come into his jail on civil commitment court orders.  In fact he was not sure if Donald Winters may not have been the only such case.

Sheriff Ferguson testified that all jail facilities and programs are available to the disabled and non-disabled equally and that there is no discrimination in access to jail programs.

Sheriff Ferguson testified that his jail policy is that, before booking, it is necessary to deal with any obvious medical problems.  In this case because of his behavior, Donald Winters was taken directly to Bates first.  When Bates would not keep Mr. Winters, the deputies brought him

to the Detention Center.  He noted also that upon Mr. Winters second visit to Bates he was found to be medically "stable" before he was returned to the Detention Center.

Sheriff Ferguson testified that the absence of psychiatric beds in his area – the Northwest area of the State – creates a big problem.  He acknowledged that the State Legislature has appropriated some 11.5 million dollars over the last few years to help deal with this problem.  However, he has not noticed any real changes on the ground.  Sheriff Ferguson expressed his frustration along with other sheriffs in the state with having to deal with such problems as those presented by Mr. Winters and others acutely mentally ill persons without having the necessary resources available in the region.

Sheriff Ferguson testified that he believes that all of the deputy sheriffs acted in good faith and that no one in the Sheriff's Office acted with deliberate indifference to Mr. Winters' medical or psychiatric problems.  He testified that in fact, "we did everything humanly possible" in the effort to respond to those problems.

Defendant's Exhibit 9 sets forth the policy and procedures of the Benton County Jail.  The section, entitled "Philosophy," reads as follows:

> A.  This jail facility was designed and constructed to provide the citizens of Benton County with a safe and secure environment either complying with, or exceeding the standards stipulated by local, state, federal and professional agencies.
> B.  All jail operations will ensure that inmates remanded are provided with a safe secure and humane treatment consistent with applicable standards, laws and judicial decisions.
> > 1.  Inmates will be classified to the least restrictive mode of housing with due consideration to the safety of the public, inmates and staff.
> > 2.  Essentials of human life, i.e., medical and mental health care, nutritious meals, recreation, clean environment and religious counseling will be provided to all inmates.
> C.  The continuity of family and community contact will be encouraged by appropriate policies governing visiting, telephone usage, volunteer involvement and mail.
> D.  Community involvement will be encouraged through the use of citizens'

committees and volunteer organizations.
E.  Staff will participate in the implementation of the facility's goals, objectives, policies and procedures.

(Defendant's  Exh. 9).

The policy section on the "use of force and restraint" includes the following language:

A.  Physical force and restraints shall be used as a last resort.  Jail staff shall use the proper escalation of force starting with the lowest level appropriate for the situation.
B.  Jail staff shall use only that amount of force necessary to gain and maintain control of an inmate in a volatile situation to avoid or minimize injuries to all persons involved.
C.  Force and restraints shall not be used as a form of punishment.

(*Id.*).

### (6)      Investigation Summary, Arkansas State Police

The Arkansas State Police Investigation Summary states in pertinent part:

Deputies Castaneda and Switzer in central control see Mr. Winters fall hard in his cell.  Deputy Switzer calls booking to have Deputy Falkenbury check on him.  Deputy Falkenbury receives call from central control advising that Mr. Winters has taken a hard fall.  Sgt. Montgomery walks over to detox cell, looks in and advises Winters looks fine.

Deputy Castaneda sees Mr. Winters fall again in his cell and contacts booking to check on him.  Deputy Castaneda is relieved by Deputy Christerson at 3:25 p.m.  Deputy Gage checks on Mr. Winters at 3:35 p.m. by going into the detox cell where he grunts and crawls over on his mat when he is asked if he is all right.

Deputy Gage goes into detox cell at 4:15 p.m. to check if Mr. Winters wants to eat.  He notes Mr. Winters is unresponsive and not breathing.  Deputy Gage calls for Sgt. See and when Sgt. See checks Mr. Winters he has an ambulance called.  Deputies Reynolds and Cranston come into the cell begin CPR on Mr. Winters.

Bentonville Fire Dept. Ambulance was called at 4:28 p.m. January 1, 2003 and arrived at 4:32 p.m.  The paramedics placed a cardiac monitor on Mr. Winters and determined that he does not have a pulse. . . . Paramedics instruct deputies to stop CPR.

(County Defendant's  Exh. 37).

3.    **Cause of Death**

On January 3, 2003, the Arkansas State Crime Lab reported on the "cause of death" of

Donald William Winters.  The pathologist of record was Dr. Stephen A. Erickson but the report

was also signed by Dr. Frank Peretti, Associate Medical Examiner, Dr. Charles P. Kokes,

Associate Medical Examiner and Dr. William Q. Sturner, Chief Medical Examiner.  Dr. Peretti

reviewed this report (Defendant's  Exh. 38) and testified concerning same.

Dr. Peretti was called as a witness by the State Defendants.  He is the Associate Medical

Examiner with the Arkansas State Crime Lab.  He is a graduate of Brown University and trained

in forensic medicine in Baltimore, Maryland.  Dr. Peretti came to Arkansas in August of 1993.

The first page lists the "cause of death" by "autopsy" to be "peritonitis due to perforated

duodenal ulcer with multiple blunt force injuries of head, trunk and extremities including

fractured ribs."  The "manner of death" was listed as "pending" since the investigation report had

not been completed nor had the Crime Lab received the medical/hospital records.

The autopsy report is divided into the following sections: external description; evidence

of medical attention; evidence of old injury; evidence of recent injury; internal examination;

weights of organs; cardiovalcular system; respiratory system; neck; alimentary tract; liver and

biliary system; pancreas; genitourinary system; reticuloendothelial system; endocrine system;

musculoskeletal system; central nervous system; histology; laboratory results; findings; opinion;

and manner of death.

Dr. Peretti testified that the blunt force injuries that Donald Winters sustained were not

life-threatening.  It is his opinion that Mr. Winters died from peritonitis caused by a perforated

duodenal ulcer. He testified that the ulceration was "chronic." It was Dr. Peretti's opinion that the

ulcer had been present for some time but he could not say exactly when the ulcer perforated

although it was his guess that Donald Winters died less than 24 hours after the ulcer perforated.

He testified that Mr. Winters did not die from any of the self-inflicted injuries he sustained from

striking his head or extremities on the metal toilet in the holding cell or from struggling with the

officers or against restraints such as handcuffs or leg-irons, although those incidents caused

almost fifty bruises and abrasions on Mr. Winters' body and may have caused some of his broken

ribs.  Dr. Peretti acknowledged that stress could contribute to the perforation of the ulcer. He

further testified that some of the bruises and abrasions could have been old and the autopsy

report states that the internal examination "revealed fracture calluses at the right sterno

clavicular junction with the first and second rib, and the left first rib.  On the left eighth and ninth

costal cartilage junction there were fracture calluses present."  (Autopsy Report, Defendant's

Exh. 38).

        The Court notes the following entry in the autopsy report under the heading, "Alimentary

Tract":

        One half inch distal to the pyloric ring was an ovoid, 1.5 x 1 cm, completely
        perforating ulcer on the anterior wall.  The edges were smooth and rounded,
        without neoplastic change in the surrounding wall.   There was no evidence of
        associated mucosal hemorrhage.

        Under the sub-heading "Gastrointestinal tract" in the histology section, the Autopsy

Report reads:

        A section from the duodenum shows ulceration through the serosa and muscularis.
        Varying amounts of fibrinous exudate are noted.  There is no tumor.  A section
        near the ulcer shows underlying muscularis mucosa, acute inflammation, and
        necrosis, with overlying necrosis and ulceration of the mucosa.

        The "opinion" section of the report, in its entirety, states as follows:

        In consideration of the circumstances of death and after autopsy of the body, it is
        our opinion that Donald William Winters, a 59-year-old white male, died of
        peritonitis due to a perforated duodenal ulcer with multiple blunt force injuries of
        the head, trunk, and extremities, including fractured ribs.

(Autospy Report, Defendant's Exh. 38).

The Court has carefully reviewed all of the evidence and finds therefrom that Donald Winters died from peritonitis due to a perforated ulcer that more likely than not perforated sometime after his arrest on December 28, 2002.  This conclusion is based upon the testimony of Darin Winters about his father's condition just before Darin left for St. Louis on December 27, 2002;  the strong and recurrent refusal of Donald Winters to drink water or other liquids after his arrest;  Donald Winters' constant referral to such liquids as "acids;" the autopsy description of the actual perforation caused by the ulcer and SSA W.B. Baskin's "Investigator's Notes" stating, "The soft tissue adjacent to the duodenal ulcer did not have any apparent trauma."  (Defendant's Exh. 38).

The Court specifically finds that there is no competent medical testimony that the contusions, abrasions or fractured ribs caused or contributed to, or accelerated, Donald Winters' death.  In passing, the Court also finds that the contusions, abrasions and fractured ribs were caused by Donald Winters striking his head, torso and extremities against the toilet and his resistance to and struggling against handcuffs, leg and other restraints.  The Court further finds that the Defendant Sheriff and his deputies did everything within reason to protect Mr. Donald Winters from injuring himself.

The Court also observes that Mr. Donald Winters' mental condition may have contributed to his death.  It appears that the various doctors and nurses with whom he came in contact found it almost impossible to communicate meaningfully with him and therefore, may have been denied information that otherwise may have led them to be suspicious of, and caused them to check more carefully into the possibility of a perforated ulcer in time to alter the course of events.  It is clear to the Court that none of the medical personnel from their examinations and testing of

Donald Winters even considered that possibility.  None of the parties have argued medical malpractice in this case and, indeed, neither Bates Medical Center or Ozark Guidance Center or any of the doctors or nurses who examined Mr. Winters, are parties to this lawsuit.  Obviously, the actual State Defendant and County Defendant had no control over, or responsibility for, the actions, opinions and decisions of such medical personnel.

The Court concludes that the acts or omissions of the Defendants did not cause or contribute to the death of Donald Winters.

The question remains whether Donald Winters was entitled to a same-day admission to the ASH on the basis of any of his legal theories.

### 4.   Views of Mental Health Experts and Other Interested Parties

#### (a)   Dr. Robin Ross' Testimony

Dr. Robin Ross, a psychiatrist, was called as a witness by the Plaintiff.  She has practiced psychiatry in Arkansas since 1993 and worked at the Ozark Guidance Center.  Her immediate supervisor was Dr. Lance Foster.

Dr. Ross never saw or treated Mr. Donald Winters. Her testimony with respect to the Winters case was based principally upon her review of the records. The Plaintiff also used her experience to describe the recent history of psychiatric care in the Northwest region of the State of Arkansas.

Before April of 2002, persons presenting at Ozark who required in-patient psychiatric services were referred to a wing in the Springdale Memorial Hospital known as Highland Hall. There were some twenty psychiatric beds available.  When Highland Hall was closed, an effort was made to manage as many of the patients as possible on an out-patient basis.  According to Dr. Ross, before the closing of Highland Hall there were between 7 and 15 people a week

admitted.  After Highland Hall was closed, those people still came but there was nowhere to admit them.  She was greatly concerned by this and communicated her concerns to Dr. Miller at the Arkansas State Hospital.  She wanted to let him know that the people at Ozark were hoping to lean on the ASH for more help.  He replied that he would help in any way he could.  She states that for a brief period after the closing they were able to "make do" by prevailing upon local hospitals to take some psychiatric patients, relying on the good reputation of Ozark Guidance Center.  Over time, however, no real solution was forthcoming.  These hospitals (which had no legal obligation to take such patients) burned out to the point that they would no any longer admit people with acute psychiatric illnesses.  So, without the needed resources, Ozark would on occasion return such patients to jail.

Dr. Ross does testified that jails are not appropriate places to house or treat the acutely mentally ill.[5]  Dr. Ross noted that the type of behavior demonstrated by Mr. Winters including injuring himself, masturbating, spreading feces around the cell, etc, were consistent with a lack of reality testing associated with a psychotic illness.  She states that the proper protocol for handling persons exhibiting such overt behaviors would usually be first to medicate the person.  But, Dr. Ross pointed out that in-patient psychiatric hospitals are equipped with seclusion rooms and other means of restraint.  These are used when the patients are not able to control their behavior.  She also testified that without intervention the psychosis usually worsens and behavior worsens.

Dr. Ross stated that since the closing of Highland Hall there have not been adequate facilities to permit the psychiatrists to do their jobs.  She acknowledged that since the Winters

---

[5] Of course jails and prisons can, and often do, have the facilities and the professional staff needed to handle acutely mentally ill patients.

case the legislature has appropriated funds for some 16 beds.  This is four beds less than existed before Highland Hall was closed.  She believed that 20 beds was probably adequate but that 16 beds would not meet today's needs.  She did not know how many beds would be required but she stated that "we now have none for indigent care."

Vista is a private for-profit free-standing psychiatric hospital that Ozark contracts with to provide five beds.  Ozark pays for the beds whether they are filled or not.  Dr. Ross stated that it is a "locked facility" which would not be equipped to handle cases like Mr. Winters because it is not associated with a medical-surgical hospital and is not equipped to handle the level of behavioral discontrol that Mr. Winters exhibited.  She acknowledged that Vista Health has a seclusion room but stated that it is used only for storage.

In Dr. Ross' view, an in-patient psychiatric facility capable of handling someone like Mr. Winters would require having a doctor on the premises 24 hours a day to meet the regulations that go along with secluding or restraining someone.

Dr. Ross observed that the records indicated that Mr. Winters was acutely psychotic, aggressive and angry when brought to the Ozark Guidance Center on the evening of December 31, 2002.  Physically he was dehydrated, had cracked lips, lacerations, bruises and poor circulation.   The tentative diagnosis was delusional disorder, paranoid type, for which there is no cure.

Dr. Ross stated that when Ozark determined that space was not immediately available at ASH, the staff there explored other options without success.  She acknowledged they did not contact Missouri or Oklahoma alternatives or Hot Springs or Malvern.  She testified that records indicate that the Ozark medical staff forcefully administered two shots into Mr. Winters' buttocks, one an anti-psychotic.  She looked upon Mr. Winters as a "medical emergency" who

was "substantially impaired."  Dr. Ross stated Ozark did not admit Mr. Winters because no program was available to admit him into.

Ozark recommended that Mr. Winters be taken to an Emergency Room in Bentonville ("Bates").  Ozark instructed deputies to transport Mr. Winters to Bates and then to return him to jail to await placement.

The required Single Point of Entry (SPOE) form was completed on Mr. Winters and faxed to ASH.[6]  It set forth demographic data and psychological signs and symptoms.

Dr. Ross described the three units at the ASH: (1) adolescent beds; (2) forensic patient beds; and (3) acute care beds.  The acute care unit is where acutely ill persons under civil commitment orders go.  Each unit has two seclusion rooms.

Dr. Ross stated that it was unusual to be able to get an admission to ASH within 48 hours.

She testified that one in Winters' condition needs to be in a facility that has nursing personnel and a doctor available 24 hours a day and that he be subject to continuous monitoring by camera.

She acknowledged that restraints may be used.  She believes "chemical restraints" are "ethically unacceptable" because they are not treating the underlying disease but still they are often needed to calm such a person. But, they should not be used just to "warehouse" patients. Dr. Ross acknowledged using chemical restraints on patients about once every week.

She testified that Ozark provided "after care" instructions to deputy sheriffs for handling Winters on his return to jail.  Dr. Foster had prescribed and sent along Zyprexa Zydia, an atypical anti-psychotic drug to be administered orally. No explanation was provided by Dr. Ross – or any other witness-- of how Ozark understood that sheriff's personnel would be able to administer the

---

[6] The fax message was not introduced into evidence.

drug.  As it turned out, Winters refused to take the prescribed drugs.

Dr. Ross acknowledged that Ozark did not follow up to see if the prescribed drugs were taken by Mr. Winters or to otherwise monitor his condition after he left Ozark on the night of December 31, 2002.

Dr. Ross testified that Ozark physicians could have gone to the jail to further sedate Winters.  She herself has made "house calls" to jail.

**(b)    Dr. Larry Miller's Testimony**

Dr. Miller is presently the Medical Director of the Division of Behavioral Health Services (since July 2005).  He previously served as Director of the Arkansas State Hospital for some ten and one-half years.  His testimony is useful not only for the information conveyed but also because it serves to reveal the differences of opinions within the medical community concerning the resources needed to deal effectively with the mental health problems facing the State of Arkansas.

When Dr. Miller was asked if there were enough beds now available he replied, "A few more would be helpful."  He generally believes that today Arkansas has about enough beds.  He noted that the number of beds has fluctuated over the years.  Several years ago there were 380 beds.  Then they decreased to a low of 288 beds and are now back up to 305 .  He believes over all that 300 beds should be enough if properly utilized.

Dr. Miller agrees that after Highland Hall was closed in April of 2002 the State was faced with a serious problem.  However, beginning in November of 2003 the number of beds began increasing again.  He further acknowledged that the State still encounters access problems sometimes as often as twice a week.  He also opined that, "some people think we need more beds than we really do."  He took note of the various State plans – much of which have already been

implemented.

According to Dr. Miller, 90 beds are technically available for people like Donald Winters but in reality the number is 74 because 16 are restricted for "911 beds." So 74 beds are available for non-forensic patients while 80 beds are available for forensic patients.

Dr. Miller stated that ASH received two to ten applications per day, but he opined that at least 30% of the requests lack merit and did not require admission to ASH. He stated that Donald Winters, if medically stable, would have been an appropriate candidate for admission but that he was not admitted because Ozark said that he was not medically stable and that he was being sent to the emergency room to make him stable. The Court notes that the other evidence does not seem to support this particular testimony. However, the actual fax request from Ozark to ASH was not introduced into evidence.

Dr. Miller had no personal knowledge of the Winters case. He based his opinions upon the medical records he has reviewed.

Dr. Miller testified that ASH policy requires a finding that the patient is medically stable before he/she will be admitted for psychiatric treatment. But when ASH receives the SPOE form the patient is placed on the waiting list if no bed is available whether or not it has been determined that the patient is medically stable.

When asked if Northwest Arkansas is worse off than other regions of the State in terms of facilities or access he stated his opinion: "Same as everybody else." The state now contracts with some 15 community health centers located in cities around the state. Ozark Guidance Center is one of those centers. Dr. Miller favors regional state centers because they are better able to served the needs of the patients and families who live in those regions. He believes that the system today is much better than it was in 2002, but once again added, "Perhaps we could use a

few more beds."

There is a spectrum of care "utilized by mental health experts" ranging from out-patient to long term in-patient treatment.  He believes that each of the pieces of the system must be strong so that beds will not be misused or wasted.  He agrees with the *Olmstead* decision[7] pursuant to which patients are treated in the most appropriate least restrictive environments.

Dr. Miller testified that we now have 8 or 9 "seclusion rooms" that is one per unit. Earlier there were 16.  He does not agree that Donald Winters was in need of a seclusion room. What he needed was in-patient care.  He felt that medication might negate any need to use a seclusion room.

Dr. Miller stated that priority in assignment of beds should be based on acuity, when there are fewer beds than needed.

When he served as Medical Director for the ASH for ten and a half years, Dr. Miller stated that people in jail were given less priority than some others because "if they were in jail at least they would not be a danger to others." According to Dr. Miller if we had unlimited resources there would be no admission problems.  However, where resources are limited one must prioritize.  He admitted that in the worst situations counties are left "holding the bag" and our "jails become the State's mental health hospitals."

In discussing admission priorities, Dr. Miller stated that persons in jail are neither at the top of the priority list or at the bottom.  "They are like number 4 out of 9."  The lowest priority is assigned to those who are being treated in one facility but wish to be transferred to ASH for further treatment.

Since 2002, 11.5 million dollars in new money has been put into the system.  The State

---

[7] The *Olmstead* decision is discussed in detail, *infra*.

used this money to contract with local centers to provide local acute care.

Dr. Miller faulted some of the work and opinions of Dr. Diadone of the Bates Hospital who was the last physician to see Mr. Donald Winters before his death.  Dr. Diadone examined Mr. Winters twice over a one and a half to two hour period and released him as "stable."  (See the summary of Dr. Diadone's testimony, *supra*).  Dr. Miller noted that Mr. Donald Winters' blood sugar was reported at 218 when the normal is around 108.  He felt that several other readings were "out of line."  It is his opinion that Dr. Diadone raised questions about blood sugar but did not follow up thereon.  According to Dr. Miller, Dr. Diadone should have drawn blood again and performed more tests.

He speculated that if Donald Winters had arrived at the ASH they would have sent him to an emergency room in another hospital to be stabilized before admitting him for psychiatric evaluation.  Dr. Miller stated that today there are four centers in the State with crisis capability.  He also points out that Highland Hall (which was closed in April of 2002) was a private facility that closed for financial reasons.  It appears that Highland Hall provided services for acute care patients but did not receive payment therefor.  So, Dr. Miller pointed out that the State was not responsible for the closing of Highland Hall.

Once again, Dr. Miller stated that he would deny Donald Winters admission to ASH because of his high blood sugar.  That problem would have to be cleared up before ASH would accept him for psychiatric evaluation.  It is interesting to note that Dr. Ross shared this view.  She made the point that many physical or medical problems create psychotic symptoms including viruses, infections, and even such conditions as pneumonia.  Therefore those conditions must be cleared up before a definitive psychiatric diagnosis can be made.

Dr. Miller stated that the ASH did not learn of Donald Winters' medical condition until

"a couple of weeks ago," *i.e.* in 2006, years afer the event.

When asked where the Sheriff should have taken Donald Winters, Dr. Miller opined "Bates should have kept him even though they had no in-patient beds available." He believes that, contrary to Dr. Diadone's opinion, Donald Winters was medically ill and should not have been sent back to the jail. He also opined that no proper diagnosis of mental health needs can be made until the patient is medically stable.

**(c)      Dr. G. Richard Smith's Testimony**

Dr. G. Richard Smith, presently the Chair of the Department of Psychiatry at UAMS, was previously an admitting officer for ASH. He described the requisite spectrum of care from the least restrictive to the most restrictive. He noted that ASH has a limited capacity to handle medical or physical care problems. It is essentially a free-standing psychiatric facility. He advised that UAMS intends to open 40 beds on its campus. He identified four groups to be served by these beds: (1) general acutely psychotic without medical problems; (2) geriatric; (3) young adults; and (4) medically involved, such as those with eating disorders.

Dr. Smith stated that Mr. Winters' acute peritonitis could have been treated at UAMS and, if necessary, ASH would have sent a psychiatrist to UAMS to attend until the "body problem" had been taken care of. Dr. Smith observed that it is first necessary to make the patient safe and then to treat him. In order to properly treat a patient there must be some ability to communicate with him.

Dr. Smith pointed out that Bates is a facility without an acute mental health bed. He testified that the waiting list at ASH has been a matter of contention for at least twenty years. The demand on ASH became greater as regional hospitals closed. Dr. Smith served on the Governor's Mental Health Task Force and advocated for regional capacity. He also observed

that plans exist which call for the demolition of the ASH and the building of a new facility.

### (d)     Other Witnesses

The Court chooses not to detail the testimony of the other witnesses, not because their testimony is not important or interesting.  To the contrary, their testimony reveals the struggle to improve the lot of the mentally ill in Arkansas and particularly in the Northwest region of our state.  For instance Mr. David Williams, Ozark's CEO,  reviewed some of the history of mental health care in Arkansas, discussing both the addressed and unaddressed needs.  He explained the impact of the Highland Hall closing.  He analyzed the financial and budgetary considerations, the effect of federal programs and the federal-state tensions.  He reviewed in detail Plaintiff's Exhibits 23, 24 and 25 which reflect studies addressing the problems, the studies' findings and recommendations.  He then identified those that have been implemented and those that have not been implemented.  He stated his opinion that "same-day" admissions "are not beyond the realm," pointing out that this objective was actually accomplished for a period in the 1980s.  He believed it should be a minimum standard and that a proper mental health system should be able to respond immediately to cases like that of Donald Winters.  Interestingly, he also noted efforts to make adequate arrangements for in-jail treatment of acute cases.

Mr. Skipper Polk, the Chief Deputy of the Pulaski County Sheriff's Office until May, 2005, provided the perspective of jail administrators who deal daily with inmates who are, or become, mentally ill.  He estimated that 80% of his jail population of some 1100 inmates were pre-trial detainees with some 250 serving their sentences following a conviction.  He noted the difficulty they had in getting admissions to the ASH.  It appears obvious that most of his observations had to do with persons detained because they have been arrested and charged with a crime – mostly misdemeanors.

Mr. Polk made the point that under current law, jail officials are prohibited from forcefully medicating inmates or detainees without a court order.  He felt that the doctors at ASH were not as concerned about the mental health problems of those in jail, *i.e.* that they felt they did not have to worry as much about persons in custody as those mentally ill who are free in society. With respect to the few inmates under civil commitment orders, Mr. Polk testified that such persons were frequently put on the "waiting list."  He estimated the usual delay as "probably more than a week."

**5.**      **Aftermath of Closing of Highland Hall**

It can readily be seen from a review of the pleadings and the evidence that while the County Defendant (the Sheriff in his official capacity) vigorously contests and resists Plaintiff's claims against him, that same Defendant finds joint cause with the Plaintiff in the latter's claims against the State Defendant.  This serves to emphasize that in the background there is a palpable conflict between the Northwest region of Arkansas and the central (Little Rock ) area of the State, over the distribution and availability of mental health services and facilities for indigent acutely mentally ill persons.  Little Rock is the site of the Arkansas State Hospital – the principal resource in the state for dealing with the mentally ill.  Until April of 2002, the Northwest area had available some 20 psychiatric beds at Highland Hall.

For budgeting and other reasons, the Northwest region lost its services and facilities in April 2002.  This has created immense problems that have been studied and reviewed in the reports cited herein.  Some relief has been obtained since 2002.  But, the reports and the evidence make clear that the problems presented have not been solved even at this late date.

Plaintiff points to the "Report of the Northwest Arkansas Mental Health/HIV Crisis Stabilization Task Force," dated October 2002, the "Report of the Governor's Mental Health

System Task Force," dated June 2002 (Plaintiff's Exhibit 23); and to the Report of the Acute

Care Sub-Committee of the Mental Health council (Plaintiff's Exhibit 24) to support his

contention that the inadequacy of the State system to deal with the acutely mentally ill was well

known to the Defendants months before Mr. Winters was arrested on December 28, 2002.

    The Court has carefully studied all of these reports.  It will now quote pertinent excerpts

therefrom, starting with the "Executive Summary" in the Stabilization Task Force Report:

> Findings: As a result of our loss of 20 psychiatric beds in Northwest Medical Center, mentally ill patients usually cannot get the inpatient care they need. Demands on hospitals' emergency/ICU services, Ozark Guidance crisis stabilization/intensive outpatient services, and city/county law enforcement agencies have escalated substantially.  Access to Arkansas State Hospital is inadequate statewide.
>
>> As the largest population area in Arkansas without adequate psychiatric acute care, we need a minimum of 36 beds (which is less than the national average of 40-60 for a population our size due to intensive outpatient alternatives through Ozark Guidance), but only 12 are available through Vista, a free standing psychiatric hospital which Medicaid will not pay for adult inpatient care.  We have what we need locally for people with broken bodies or broken hearts, but not for people with broken minds.
>>
>> The projected charitable care costs for an additional 24 beds is expected to be $950,00 annually (in addition to charitable care costs borne by Vista, other hospitals' emergency services and Ozark Guidance's emergency and crisis stabilization services) and costs for renovating a general hospital to psychiatric facility standards is estimated at $1,000,000.
>>
>> The State of Arkansas is out of compliance with its constitutional mandate to provide adequate care for its mentally ill citizens.  Judge Reasoner's court order for compliance in evaluation and treatment of prisoners and the Governor's Mental Health System Task Force report call for system and financing changes to turn this situation around.
>>
>> Our task force coalition of health/mental health providers, county officials, law enforcement, court, consumer and family representatives will work together to meet our area's needs for adequate acute mental health care systems/service coordination, but it will take adequate state funding for charitable care demand to assure access.

RECOMMENDATIONS:

Develop 12-bed psychiatric acute care capacity in a general hospital by no later than July 2003,and add 12 more as funding makes it feasible.
Fully fund Act 1589 for $11,500,000 by supplemental appropriation immediately.
Expand Medicaid to cover elderly and disabled persons at 100% of FPL income including RSPMI outpatient services to keep costs & inpatient demand down.
Sustain intensive outpatient/crisis stabilization services to reduce hospital demand/cost.
Guarantee back up availability to ASH for 11% of beds there for NWA use.
Contract with DHS for all NWA forensic evaluations and treatment to be based in Benton/Washington County jails and served by Ozark Guidance treatment staff.
Develop a four-county training and coordination for law enforcement/mental health/health crisis intervention teams based on Memphis, Tennessee model.
Advocate for changes in the commitment law, mental health parity in Medicaid/Medicare/commercial insurance, adequate block grant/state funding for community based mental health services.  Add prescription coverage to Medicare.

Under "Mental Health Service" we note the following "Findings":

Our system for mental health acute care is broken so people aren't getting their treatment needs met and helping organizations are significantly distressed.  As expected, the loss of the 20-bed inpatient capacity resulted in mentally ill people and their families not getting the timely and appropriate psychiatric acute care they needed. A freestanding inpatient psychiatric hospital for adults is located in Fayetteville; however, that facility cannot be paid for Medicaid patients and, since it does not have an emergency room, it is not a resource for the large portion of the psychiatric population that needs inpatient care for acute episodes.  Due to this 20-bed loss, demand for services has shifted as follows:

> to hospital emergency and intensive care units,
> to outpatient intensive care units,
> increased demands on city and county law enforcement agencies,
> further inability to access Arkansas State Hospital when needed,
> extra ordinary anxiety, frustration and distress for health care and law enforcement personnel,
> Extended illness and deterioration of people not receiving timely care and prolonged suffering, frustration and anxiety for families in our area.

* * *

> Law enforcement officers transporting mentally ill citizens for evaluation are bounced from outpatient to hospital emergency services due to service gaps, differing interpretations of legal responses and differing capacities with no consistently dependable capability of meeting all presenting problems of mentally ill people existing in our area.

Under the caption "Service Recommendations For Mental Health" we find, *inter alia*, the

following:

> Establish capacity in the new Washington County Jail and/or Benton County Jail
> and/or other appropriate facilities for up to 16 prisoners from our 4 county area to
> receive forensic evaluations and treatment in a timely manner consistent with
> Judge Reasoner's Federal Court order.  This will cover prisoners with felony
> charges or court orders to hold them in jail for evaluation
>
> Background: In response to the court order, the Department of Human Services is
> considering decentralization of the forensic evaluation and treatment services
> customarily done in Little Rock at ASH.  We would be seizing the opportunity to
> do this in northwest Arkansas.  Inmates from area jails could be transferred here
> for the evaluations with counties bearing the per day cost for incarceration. DHS
> would provide forensic evaluation and treatment funds for Ozark Guidance staff
> to do-in jail or outpatient evaluations and treatment as appropriate to the
> prisoner's condition and security requirements.  This would result in timely
> evaluation and care, savings for all organizations and better efficiency in criminal
> court processes.

* * *

> Develop and maintain capacity for appropriate treatment and triage for mentally ill
> patients presenting in each hospital emergency room or, when security for public
> or personal safety is a priority, in city jails.
>
> Background: Local experience indicates about half of the people presenting
> mental illness symptoms can be stabilized with appropriate procedures and
> protocols, then transferred to appropriate outpatient or inpatient care within 24-72
> hours.  Also, 72-hour holds are crucial to patient care, due process and safety, as
> well as hospital safety and risk management.  The intention is to clarify due
> process protections for patients and hospitals in the event a 72-hour hold becomes
> medically necessary.

* * *

> Immediately create a fund in DHS to pay for a psychiatric forensic evaluation and
> treatment team to be based out of Ozark Guidance and provide timely evaluation,
> triage and treatment to prisoners in our four county area, beginning in January
> 2003.
>
> Background: Arkansas Department of Human Services is under a court order and
> monitoring to provide a statewide system for timely evaluation and treatment for
> mentally ill prisoners by July 1, 2003.  We have a board-certified forensic
> psychiatrist in our service area and our courts/law enforcement and mental health

center are ready, willing and able to arrange security and care to do these locally. This would be very cost-effective for all parties while protecting prisoners' constitutional rights to timely evaluation and care.  This would be done on an outpatient and jail visitation basis until construction allows for housing in the new Washington County Jail or elsewhere. It would include capacity to do emergency assessments, triage and treatment for city jails.

Under "Conclusions" we find the following:

We have found that our area has a severe shortage of acute care beds for psychiatric care and lack of access to Arkansas State Hospital that has resulted in people not getting timely appropriate care.  This has resulted in demand shifting to outpatient crisis services, hospital emergency rooms & ICU, shelters and law enforcement organizations without adequate resources to meet the demand. Because of this, mentally ill people and their families are suffering unnecessarily and our communities are not as healthy and safe as before.

We believe it is possible to fix the problem locally with a combination of sustaining outpatient acute care systems, rebuilding hospital capacity and developing a coordinated system of law enforcement/health/mental health crisis stabilization teams area-wide.

We need state funding immediately to start repairing and improving our local acute care response capacities and a combination of state, federal and commercial insurance funding to make our local system financially sustainable in the foreseeable future.

We believe we can add 12 beds, get initial community intervention training done and assure continuation of our local intensive outpatient acute care and support systems by July 1,2003 if the State of Arkansas will act on its constitutional responsibility to care for mentally ill people with adequate funding arrangements.

We will plan implementation steps cooperatively as funding unfolds Depending on the speed of adequate funding for community based acute psychiatric care, it will take 2-5 years to recover adequate capacity and build the coordinated system.

In the Governor's Mental Health System Task Force Report under the initial heading

"Where we are" we find:

The demand for services to meet the critical needs of mentally ill adults and emotionally disturbed youth in our communities continues to grow while the services available are not increasing and in fact are shrinking in many parts of the state.  The services that are available too often do not include those most appropriate to meet the needs of our people.

Arkansas is not alone in this crisis of care for people with mental illness.  The challenges we face also confront most states in this country.  The indication of a disintegrating system are clear in spite of significant increases in our expenditures for mental health services through the Medicaid program.

We are told that the annual expenditure of public funds to pay for mental health services in Arkansas including Medicaid reimbursements now approaches $400 million.  We spend more and yet serious problems remain.

Why is this?  It is partly because so much of what we spend on mental health services in Arkansas is spent on very expensive inpatient psychiatric care for a relatively small number of people.  Almost everyone involved in the public mental health system – professionals, providers, consumers and would-be consumers, their families and their advocates – agrees that many of these patients could be well-cared for in less intensive, less expensive settings if they were readily available across the state.

But it is also partly because Arkansas, like most of the rest of the country, has failed for decades to make significant changes in the system unless spurred to do so by some tragic set of circumstances involving violent acts by one or more persons suffering with lifelong psychiatric illness.

Community hospitals with psychiatric units working with their local community mental health centers had nearly 5,000 admissions to those units last year.  Most of those hospitals have closed their psychiatric units because our system denied them an avenue by which they could be paid for the care provided to persons who could not pay and who had no insurance that would do so.  Since Arkansas is forty-ninth in the country in the number of state-operated psychiatric beds per one hundred thousand population, the State Hospital cannot take up the slack created by these closings.  As a result, there is every reason to anticipate that the coming year hundreds of seriously mentally ill persons who present a "clear and present danger to themselves and others, and therefore are in need of acute inpatient psychiatric care, will be denied that care.  They will remain in their communities without adequate care until their behavior brings them to the attention of local law enforcement and they are placed in county or municipal jails for their own protection or to protect the community.  This, of course, will place further strain on the jails and their personnel who are already struggling to care for dozens of inmates awaiting court-ordered psychiatric treatment or evaluations at the Arkansas State Hospital – which is too full to take them on a timely basis.

Under the Section "And what we need to do" the Report states:

We must understand there are no easy answers, no simple solutions, to these issues.  Years of benign neglect of the public mental health system and the failure of many components of that system to change – to embrace new and better ways of providing care – have combined to bring us to the critical juncture we now face

- 58 -

We must evaluate Arkansas's public mental health system and hold those who manage it accountable for the effectiveness of the services they provide and for the public funds they control.  We must be willing to consider new approaches to financing and providing care for our mentally ill and the emotionally disturbed people.  And we need to do it as quickly as we can.

We must examine and revise as necessary the laws and public policies that enable our public mental health system and define its responsibilities and authority.  We must continue to include all those who have a stake in the system in our diligent search for better policy and more responsive and effective service systems.

We must together rethink the public mental health system; strengthen accountability for access, availability, and quality of care; support effective community-based services; push for reliance on evidence-based practices in mental health care; and create stable and adequate mechanisms for funding mental health services.

California's Little Hoover Commission, in its publication *Being There: Making a Commitment to Mental Health*, said that "what sets mental health apart from other social and medical causes is that we do not share a collective expectation or sense of responsibility – and as a result, there is little outrage when mental health programs fail."

Please consider this report from those of us on the Task Force to be an expression of outrage at the failures of Arkansas's public mental health system and a plea that the recommendations the report contains be implemented now.  The sixty thousand Arkansans who depend on the system can't wait.

(Plaintiff's Exh. 23).

Plaintiff's Exhibit 24 contains the Report of the Acute Care Sub-Committee of the

Mental Health Council of the State of Arkansas, dated January 11, 2005.  It contains this

"Problem Statement:"

Acute Psychiatric bed care for adults ages 21-64 is neither adequate nor equitable statewide in Arkansas.  While the Division of Behavioral Healthcare Services November, 2003 initiation of contracts for private acute care beds and programs has brought relief in the form of more timely care to more than 3000 Arkansans in the last 12 months, lack of timely access to local acute care is still a daily problem for hundreds of adults each year who are suffering from severe mental illnesses that meet criteria for hospitalization. The frequency of access problems and the length of time patients have had to wait for a bed varies from time to time and from one service catchment area to another, but for some centers inadequate access is a daily or weekly chronic problem and there are still times that every

center has problems getting same day service needed for an acute care patient. Additionally, since 68 counties have no acute inpatient psychiatric beds, the time, travel and support burden on families and law enforcement is extraordinary.  This situation is inconsistent wit the intent of Article 19 of Arkansas' Constitution, which establishes care for the mentally ill ("insane") as a state responsibility. Finally, while DBHS delegates the responsibility to community mental health centers (CMHC's) for the design and delivery of adequate systems of public mental health care services, the level of funding provided is inadequate to fulfill this mission for either ambulatory or inpatient acute care.

Under "Evidence of the Problem" we find:

Arkansas has had a net loss of 126 acute adult (21-64) psychiatric beds statewide between 2001 and 2004 and 102 of them were in general hospitals capable of billing Medicaid for mental health services for this age group.

* * *

80% of centers reported days for which no hospital bed (ASH or private) was available; a range of 1-5 days wait for acute bed availability and 121 patients who could not get acute care on the same day needed during a quarter surveyed in mid-year 2004.  This would be 484 patients per year.

Among the "Patient Impacts of the Problem" we find:

Same day acute care not available as needed with waits up to five days for appropriate admissions.

* * *

Court-ordered commitments not being completed due to beds not being available and mentally ill patients who are dangerous to themselves or others being released on bond.
Criminalization of the mentally ill.

(Plaintiff's  Exh. 24)

The Plaintiff and the County Defendant and many in the medical community would obviously welcome the Court's entry of an injunction requiring the State to solve the serious problems in part exemplified by the facts of this case.  However, the Court's role is limited: it must deal only with the case and controversy presented to it by the pleadings, the evidence and the applicable laws.  If Mr. Donald Winters' constitutional or statutory rights were violated, then

- 60 -

monetary and/or declaratory and injunctive relief might indeed be appropriate.  Otherwise, the

serious issues raised and discussed here are matters appropriately dealt with by the policy-making

branches of our government, that is, the Executive and Legislative Branches.  The Legislative

Branch has the resources to bring before it representatives of competing interests, experts in the

mental health field, and budgetary experts in order to view the whole picture in the face of

limited resources.

IV.     CONCLUSIONS OF LAW

        In handling the case before it the Court first looks to the pleadings to determine the

claims being asserted. Next, it must find the facts from the evidence, and, finally it must apply

the law and return its verdict.

        1.      **Elimination of Certain Claims**

        Plaintiff's Second Amended Complaint alleges that: "Defendants have failed to complete

a self-evaluation in accordance with Section 504 of the Rehabilitation Act of 1973 as well as

with Title II of the Americans with Disabilities Act of 1990 in Order to determine whether or not

its programs and policies unlawfully discriminate against persons with disabilities." (Second

Amended Complaint at ¶ 18).  Plaintiff then goes on to allege that as a direct result of such

failure "Donald Winters was incarcerated in a facility where he could not be medicated and

where he was a danger to himself and others, which ultimately led to his death."  (*Id.*  at ¶¶ 18-

19).  The State Defendants denied these allegations and also submitted the affidavit of Ms. Abbie

Palmer, the ADA Coordinator stating her belief that this requirement was complied with "on or

before the required date of January 26, 1993."  However, the records concerning same apparently

have been destroyed.  Ms. Palmer noted that the Agency was required to keep such records for

only three years.  Plaintiff did not challenge this affidavit.  Additionally, there may be a question of Plaintiff's standing to raise this issue.  Since Plaintiff put on no proof regarding this issue at trial it is assumed that it has been abandoned.  In any event, that claim will be dismissed for failure of proof.

Plaintiff also alleged in his Second Amended Complaint the use of excessive force when he was arrested.  However, the Plaintiff agreed to the dismissal of the claims against the deputy sheriffs.  So, once again, it appears that the excessive force claim has been abandoned.  Furthermore, the Court has already found that there was no evidence introduced at the trial that would support such an excessive force allegation.  That claim will also be dismissed.

The Court also finds and concludes that the evidence and the Court's findings preclude any claim for punitive damages.

Among the alleged unconstitutional prison conditions to which Plaintiff notes Mr. Donald Winters was subjected was the unsanitary conditions of his cell at the time of his death.  It appears that during the last few hours of his life, Mr. Winters smeared his own feces on the walls and floor of his cell.

Last year, this Court handled the case of *Gwendolyn O'Neal v. The City of Pine Bluff, et al.*, Case No. 4:03-CV-00600 GTE, in which the Plaintiff contended that her Eighth Amendment rights were violated, *inter alia*, by her being confined in a cell in which feces covered the toilet, floor and mattress.  In denying summary judgment to several individual defendants the Court noted the case of *Whitnack v. Douglas County, Nebraska*, 16 F3d. 954 (8th Cir. 1994).  There, the Plaintiffs presented evidence that "Cell C-18's toilet was cover with dried feces . . . , the sink was covered with hair and vomit, the floor was covered with garbage and rotting food, and the walls were covered with dried human mucus."  *Id.*  at 956.  The Eighth Circuit opined "that reasonably

adequate sanitation and the ability to eliminate and dispose of one's bodily wastes without

unreasonably risking contamination are basic identifiable human needs of a prisoner protected by

the Eighth Amendment." *Id.*  The Court, however, went on to find that the plaintiffs failed to

present a constitutional claim because plaintiffs' bodily needs were not interfered with and they

were provided with cleaning supplies within three or four hours.  The Court explained:

> We can easily conclude that such conditions could cause actionable harm if a
> prisoner were exposed to them for a much longer period of time. While the length
> of time a prisoner must endure an unsanitary cell is undoubtedly one factor in the
> constitutional calculus, the degree of filth endured is surely another, and in our
> view, the length of time required before a constitutional violation is made out
> decreases as the level of filthiness endured increases.  We decide this case as we
> do simply because we cannot find a constitutional violation where the record fails
> to show that the conditions were of any proven adverse consequence to the health
> or other basic human needs of the plaintiffs, given the brevity of their
> confinement.

*Whitnack*, 16 F.3d at 958.

So, the question in the *Gwendolyn O'Neal* case was:  How long did the alleged conditions

persist?  Since the defendants claimed that the conditions existed less than a week and the

plaintiff contended that such conditions lasted until the third month of her incarceration,

Summary Judgment was denied and the issue was resolved at trial.

The *O'Neal* case emphasizes the point that the duration of the challenged  prison

condition may be determinative of the constitutional issue.  Again, it appears that Mr. Winters

spread his own feces around his cell during the last hours of his life.  Even though one or more

deputies noted this condition, under the applicable law that condition alone would not rise to the

level of an Eighth Amendment violation.

The Court now digresses to discuss certain tendered or suggested claims or theories, the

merits of which it will not consider.   In Plaintiff's post-trial submissions there is the suggestion

that this Court take up and consider possible independent claims under Arkansas law, claims that

were not pled in Plaintiff's Complaint, Amended Complaint, or Second Amended Complaint.

For instance,the Plaintiff states in his post trial brief: "Nonetheless, while Plaintiff acknowledges

that respondeat superior is not an appropriate basis for liability under Section 1983, the policy at

issues is embodied in Arkansas State law.  Arkansas state law requires the Sheriff to arrest insane

persons not in the custody of some discreet person.  (*See* Ark. Code Ann. § 20-47-101).  And,

Plaintiff also argues that: "once in custody, the Sheriff must insure that persons with mental

illness have appropriate mental health care, food, water . . ."  Likewise, the County Defendant

Sheriff in his Answer and Cross-Claim and in his  Post Trial Brief suggests an independent state

law claim as part of its "Cross-Claim/Claim for Equitable Relief," whereas its actual cross claim

is solely for judgment over against the State "in the event" the Court were to grant any relief

against the Sheriff in his official capacity.  In this connection, the Plaintiff and County Defendant

rely on certain state constitutional and statutory provisions and also on certain recent Arkansas

Supreme Court rulings.

　　　　For instance, Defendant Sheriff Ferguson contends that he was without power to do

anything more for Donald Winters because of the General Assembly's failure to meet its "duty to

. . . provide by law . . . for the treatment of the insane," Ark. Const. Art. 19, §19.  The Defendant

Sheriff conceded at trial that there was a failure "to provide proper mental healthcare" for Donald

Winters[8] but argues that this was not caused by the county's deliberate indifference but by the

State's "failure to provide a uniform system whereby adequate mental health care facility beds

are available in Benton County. . . for the care and custody of those persons whom the Sheriff

must take into custody for the safety and welfare of the detainee and/or others . . ."  (*See* County

Defendant's Post-Trial Brief, pp. 14-15).  Because the County is a "political subdivision of the

---

[8]  Of course any such concession is not binding on the Court.

state for the . . . administration of justice," pursuant to A.C.A. 14-14-102, the Defendant Sheriff

contends it is the State that is ultimately responsible, and it is the State that must step in

whenever the County is not given the resources "to discharge the State's constitutional duties"

which it delegated to the County to perform.  The Defendant Sheriff also relies on and  cites the

following language from the Arkansas Supreme Court's opinion in the recent "school case" of

*Lakeview School District No. 25 of Phillips County,* 2002 WL 31618995 (Ark. Nov. 21, 2002),

to-wit:

> If local government fails, the state must compel it to act, and if the local
> government cannot carry the burden, the state must itself meet its continuing
> obligation.

And, the argument continues, the state requires substantial equality among all of the citizens of

the State in providing mandated services and that any state system for funding constitutionally

required state services must result in substantial equality for all of the state's citizens regardless

of which county "may be executing the State's duty in connection with the administration of

justice."  So, this is one of the independent state law theories now being urged.  It is too late for

the Plaintiff to initiate such a claim.  There is no need to consider it in relation to the Defendant

Sheriff's cross-claim because the Court is finding no liability on the part of the Sheriff.

Another state-law approach which could readily arise in cases like this would be based on

the fact that the State is free to adopt different (and more stringent) standards in interpreting its

own constitution and may choose to provide more protection than the minimum level required by

the federal courts' interpretation of the same or similar provisions in the United States

Constitution.  Or, as stated by Mr. Robert F. Williams in his very recent article,  *The New*

*Judicial Federation Takes Root in Arkansas*, 58 Ark. Law Review 883 (2006):

> Something important is taking place in Arkansas.  After many years of
> nonparticipation in the New Judicial Federalism ("NJF"), the Arkansas Supreme

Court has made some major progress toward taking the Arkansas Constitution seriously.  The NJF is the phenomenon where state courts interpret their state constitutions to provide more rights than are recognized by the United States Supreme Court under the federal constitution.  This process has been taking place since the early 1970s and has become an established component of American constitutional federalism.  The late Justice William J. Brennan, Jr. Noted that this was "probably the most important development in constitutional jurisprudence of our times."

* * *

As Arkansas steps in to participate in the NJF, it can build on the important lessons learned across the country over the last thirty years.  First, there are really two kinds of constitutional law in this country: federal and state.  State constitutions are *real* constitutions, but they are very different from the United States Constitution.  They have different origins, functions, and forms than those of the more-familiar federal constitution.  Truly independent state constitutional interpretation cannot take place until this truth is recognized and actually internalized by Arkansas Lawyers and judges.

Second, there are two kinds of constitutional decisions rendered by the United States Supreme Court.  Decisions ruling in *favor* of asserted federal constitutional rights become the supreme law of the land and must be followed everywhere in the United States.  Decisions ruling *against* asserted federal constitutional rights, however, do not end the matter but rather leave the question, quite literally, to the fifty states for their own decisions based on judicial interpretation of their respective state constitutions, statutory enactments, or some other form of state lawmaking.

Third, there are really five different kinds of state constitutional rights that must be distinguished from each other and evaluated by state courts engaging in the NJF:

      (1) State constitutional provisions that are *identical* to their federal counterparts;
      (2) State constitutional rights provisions that are only *slightly different* from their federal counterparts;
      (3) State constitutional rights provisions that are *substantially different* from their federal counterparts;
      (4) State constitutional rights provisions with *no federal counterpart;* and
      (5) *Limitations on government,* not contained within the Declaration of Rights, but which are enforced by the courts as if they are rights provisions.

(*Id.* at 883-86).

Thus, a Plaintiff might assert a pendent state claim by contending, for instance, that there

is a different and higher state standard for "cruel and unusual punishment" and for "equal

protection" than those that have been adopted by the federal courts in their interpretation of the

same or similar provisions of the United States Constitution.  *See, e.g., Smith v. State*, 354 Ark.

226, 236, 118 S.W.3d 542, 547 (Ark. 2003);  *Jegley v. Picado*, 349 Ark. 600, 633, 80 S.W.3d

332, 350-51 (Ark. 2002);  *Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472 (2003);  *Williams v.

Arkansas Dept. of Correction*, 362 Ark. 134 (Ark. 2005);  *Farmer v. Brennan*, 511 U.S. 825,

837, 114 S.Ct. 1970, 1979 (1994).   But, as stated, no such claim has been made in this case.

> ### 2.   **The Olmstead Decision**

In discussing the law during a telephone pre-trial conference on November 8, 2005, the

Court expressed doubt about the applicability of the case of *Olmstead v. L.C. ex rel. Zimring*, 527

U.S. 581, 119 S.Ct. 2176 (1999) to the particular facts of this case.  In Plaintiff's Post Trial Brief,

at p. 15, we find this response:

> After careful reflection, undersigned counsel cannot fathom why the Court
> believes *Olmstead* is inapplicable.  *Olmstead* clearly applies to state mental health
> programs itself being an action brought by mental health patients against the State.
> The *Olmstead* plaintiffs were less mentally ill than Winters and deserved
> community placement.  Here, however, Winters was adjudged a danger to himself
> and others, so he was not entitled to community placement.  But this does not
> mean *Olmstead* is inapplicable.  *Olmstead* applies to all placements.  Once
> Arkansas required the arrest of insane persons, *Olmstead* requires Arkansas to
> place them appropriately.  A jail was not an appropriate placement for Winter.
> Under Arkansas State Hospital policy, however, Winters was afforded a lower
> priority for admission, since he was in jail.  This policy implements a method of
> administration that encourages illegal placement and, therefore, illegal
> discriminatory segregation.  Just like an institution was an inappropriate
> placement for the *Olmstead* plaintiffs, Winter's placement in jail was likewise,
> beyond dispute, an inappropriate treatment placement.  Plaintiff challenges
> anyone to contend the Benton County Jail was an appropriate treatment placement
> for Mr. Winters.

> Before examining *Olmstead*, the Court repeats that Mr. Donald Winters was arrested for

criminal trespass.  He was not arrested pursuant to Ark. Code 620-47-108 because he was an

"insane" person.  Furthermore, even after the Civil Commitment Order was entered on December 31, 2002, he had not been evaluated, nor had any treatment plan or program been devised for him. One thing was clear:  In his acutely psychotic state Donald Winters had to be at least for some brief period of time involuntarily confined, *i.e*., segregated from the broader community.

The *Olmstead* case is reviewed in detail not only because of the emphasis Plaintiff placed on it, but also because that review will set forth so well the history and objectives of the ADA and the Rehabilitation Act of 1973, the very federal acts upon which the Plaintiff relies so heavily here.

Justice Ginsburg wrote the opinion of the Court in *Olmstead* on those issues with which we are concerned.  She stated:

> This case concerns the proper construction of the anti-discrimination provision contained in the public services portion (Title II) of the Americans with Disabilities Act of 1990 (ADA), 104 Stat. 337, 42 U.S.C. § 12132.  Specifically, we confront the question whether the proscription of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions.  The answer, we hold, is a qualified yes.  Such action is in order when the State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual , and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

*Olmstead,* 527 U.S. at 587, 119 S.Ct. at 2181.

In her opinion, Justice Ginsburg points out that Congress in enacting the ADA made certain findings, including the following:

> (2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;
> (3) discrimination against individuals with disabilities persists in such critical areas as . . . institutionalization . . . ;
> (5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, . . . failure to make

> modifications to existing facilities and practices, . . . [and] segregation . . . 42
> U.S.C. §§ 12101(a)(2), (3), (5).

*Id.* at 588-89, 119 S.Ct. at 2181.

Justice Ginsburg then noted that Congress in the ADA set forth prohibitions against

discrimination in: (1) employment [Title I]; (2) public services furnished by governmental

entities [Title II]; and (3) public accommodations provided by private entities [Title III].  The

*Olmstead* case concerned Title II, the public services portion of the ADA, the key provisions of

which state:

> Subject to the provisions of this subchapter, no qualified individual with a
> disability shall, by reason of such disability, be excluded from participation in or
> be denied the benefits of the services, programs, or activities of a public entity, or
> be subjected to discrimination by any such entity."  § 201, as set forth in 42
> U.S.C. § 12132.
>                                    * * *
> (The remedies, procedures, and rights set forth in [§504 of the Rehabilitation Act]
> shall be the remedies, procedures, and rights this subchapter provides to any
> person alleging discrimination on the basis of disability in violation of section
> 12132 of this title.)

*Id.* at 589-90, 119 S.Ct. at 2181.

Congress directed the Attorney General to issue regulations implementing the provisions

of Title II or the ADA which would be consistent with the coordination regulations issued under

§504 of the Rehabilitation Act.   One of the §504 regulations required recipients of federal funds

to "administer programs and activities in the most integrated setting appropriate to the needs of

qualified handicapped persons."  *See* 28 CFR § 41.51 (d) (1998).  As instructed, the Attorney

General issued Title II ADA regulations including the following "integration regulation":

> A public entity shall administer services, programs, and activities in the most
> integrated setting appropriate to the needs of qualified individuals with
> disabilities.  28 CFR § 35.130(d)(1998).

The preamble to the regulation defines "the most integrated setting appropriate to the

needs of qualified individuals" to mean "a setting that enables individuals with disabilities to

interact with non-disabled persons to the fullest extent possible."  28 CFR pt. 35, App A p. 450

(1998).

Justice Ginsburg summarized the facts of the case as follows:

Respondents L.C. and E.W. are mentally retarded women; L.C. has also been
diagnosed with schizophrenia, and E.W. with a personality disorder.  Both women
have a history of treatment in institutional settings.  In May 1992, L.C. was
voluntarily admitted to Georgia Regional Hospital at Atlanta (GRH), where she
was confined for treatment in a psychiatric unit.  By May 1993 her psychiatric
condition had stabilized, and L.C.'s treatment team at GRH agreed that her needs
could be met appropriately in one of the community-based programs the State
supported. Despite this evaluation, L.C. remained institutionalized until February
1996, when the State placed her in a community-based treatment program.

E.W. was voluntarily admitted to GRH in February 1995; like L.C., E.W. was
confined for treatment in a psychiatric unit.  In March 1995, GRH sought to
discharge E.W. to a homeless shelter, but abandoned that plan afer her attorney
filed an administrative complaint.  By 1996, E.W.'s treating psychiatrist
concluded that she could be treated appropriately in a community-based setting.
She nonetheless remained institutionalized until a few months after the District
Court issued it s judgment in this case in 1997.

*Olmstead*, 527 U.S. at 592, 119 S.Ct. at 2183.

Both women filed suit alleging, *inter alia*, violations of Title II of the ADA based upon

the State's failure to place them in a community- based program once their treating professionals

determined that such placement was appropriate.

The Court made several holdings including the following:

Unjustified isolation, we hold, is properly regarded as discrimination based on
disability.  But we recognize, as well, the States' need to maintain a range of
facilities for the care and treatment of persons with diverse mental disabilities, and
the States' obligation to administer services with an even hand.  Accordingly, we
further hold that the Court of Appeals' remand instruction was unduly restrictive.
In evaluating a State's fundamental -alteration defense, the District Court must
consider, in view of the resources available to the State, not only the cost of
providing community-based care to the litigants, but also the range of services the
State provides others with mental disabilities, and the State's obligation to mete
out those services equitably.

* * *

> For the reasons stated, we conclude that, under Title II of the ADA, States are
> required to provide community-based treatment for persons with mental
> disabilities when the State's treatment professionals determine that such
> placement is appropriate, the affected persons do not oppose such treatment, and
> the placement can be reasonably accommodated, taking into account the resources
> available to the State and the needs of others with mental disabilities.

*Id.* at 597, 119 S.Ct. at 2185.

Elsewhere in her opinion Justice Ginsburg states:

> We emphasize that nothing in the ADA or its implementing regulations condones
> termination of institutional settings for persons unable to handle or benefit from
> community settings.

*Id.* at 601-02, 119 S.Ct. at 2187.

Justice Stevens, in his concurring opinion, states that, beginning in the1950s, "Victims of

severe mental illness were moved out of state-run hospitals, often with benign objectives."  *Id.* at

609, 119 S.Ct. at 2191 (Stevens, J. concurring).  He goes on to describe the "dark side" of the

otherwise generally beneficial movement:

> Nevertheless, the depopulation of state mental hospitals has its dark side.
> According to one expert: "For a substantial minority . . . deinstitutionalization has
> been a psychiatric *Titanic*.  Their lives are virtually devoid of 'dignity' or
> 'integrity of body, mind, and spirit.'  'Self-determination' often means merely that
> the person has a choice of soup kitchens.  The 'least restrictive setting' frequently
> turns out to be a cardboard box, a jail cell, or a terror-filled existence plagued by
> both real and imaginary enemies."  Torrey, *supra*, at 11.

> It must be remembered that for the person with severe mental illness who has no
> treatment the most dreaded of confinements can be the imprisonment inflicted by
> his own mind, which shuts reality out and subjects him to the torment of voices
> and images beyond our own powers to describe.

> It would be unreasonable, it would be a tragic event, then, were the Americans
> with Disabilities Act of 1990 (ADA) to be interpreted so that States had some
> incentive, for fear of litigation, to drive those in need of medical care and
> treatment out of appropriate care and into settings with too little assistance and
> supervision.

* * *

> In light of these concerns, if the principal of liability announced by the Court is not applied with caution and circumspection, States may be pressured into attempting compliance on the cheap, placing marginal patients into integrated settings devoid of the services and attention necessary for their condition. This danger is in addition to the federalism costs inherent in referring state decisions regarding the administration of treatment programs and that allocation of resources to the reviewing authority of the federal courts. It is of central importance, then, that courts apply today's decision with great deference to the medical decisions of the responsible, treating physicians and, as the Court makes clear, with appropriate deference to the program funding decisions of state policy makers.

*Id.* at 609-10, 119 S.Ct.at 2191-92 (J. Stevens, concurring).

So, while the *Olmstead* case has deservedly had an immense positive impact in the mental health field,[9] it is abstract to the facts of this case. The civil commitment order here was not based upon the testimony of Mr. Donald Winters' "treatment professionals." Indeed the purpose of the order was to get him into the hands of mental health experts "for evaluation" to determine what treatment, if any, would be required. Before April, 2002, such an evaluation would have been made at Highland Hall assumedly by referral from Ozark Guidance Center. After concluding that there was no proper in-patient facility having a bed available in the area on December 31, 2002, Ozark Guidance directed Winters to ASH for that evaluation. Mr. Winters was awaiting transfer to ASH when he died. Mr. Winters, being in an acute psychotic state, could not agree or disagree with the decisions being made about his "appropriate placement ." The "more restrictive, less restrictive" placement standard simply does not arise in this context.

**3.      Analysis of Remaining Legal Claims**

**(a)      Official Capacity Liability**

---

[9] Note Plaintiff's Exhibit 29, "The *Olmstead* Plan for Arkansas." The Executive Summary/Instructions's first sentence reveals the influence of the decision: "The word 'Olmstead' may mean little to most Americans, but the concept behind it may shape the future for millions of us."

The Court agrees with and adopts that part of the legal analysis found at pages 3 through

5 of the County Defendant's Post Trial Brief, *to-wit*:

> Official-capacity lawsuits "represent only another way of pleading an action
> against an entity of which an officer is an agent." *Kentucky v. Grahan*, 473 U.S.
> 159, 165 (1985), (*quoting Monell v. New York Dept. of Social Services,* 436 U.S.
> 658, 690, n. 55 (1978)).  A municipal corporation may be held liable for the
> unconstitutional acts of its officials or employees when those acts implement or
> execute an unconstitutional municipal policy or custom.  *See id.; see also Doe v.*
> *Washington County,* 150 F.3d 920, 922 (8th Cir. 1998); *Smith v. Watkins,* 159 F.3d
> 1137, 1138 (8th Cir. 1998).

> In Monell, the Supreme Court recognized that "Congress did not intend
> municipalities to be held liable unless action pursuant to official municipal policy
> of some nature caused a constitutional tort."  *Monell*, 436 U.S. at 691, 98 S.Ct. At
> 2036.  A governmental entity cannot be made liable by application of the doctrine
> of respondeat superior, *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036, or vicarious
> liability, *Monell*, 436 US. At 692-94, 98 S.Ct. at 2036-38.  A city or other
> governmental entity may be held accountable only if the alleged constitutional
> deprivation was the result of municipal "custom or policy," *City of Oklahoma City*
> *v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 2433, 85 L.Ed .2d 791 (1985), or took
> place pursuant to the instructions of a final or authorized decision maker.
> *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 1299, 89 L.Ed.2d
> 452 (1986).

> An official policy can be established by municipal custom if the custom is a
> practice of municipal officials that is not authorized by written law but which is
> "so permanent and well-settled . . . as to [have] the force of law."  *Monell v.*
> *Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.
> 2d 611 (1978), *citing Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167-168, 90
> S.Ct.  1598, 1613-14, 26 L.Ed. 2d 142 (1970), *quoted in Harris,* at 504 n. 7.  To
> establish a constitutional violation resulting from such a custom, a plaintiff must
> show that his alleged injury was caused by municipal employees engaging in a
> widespread and persistent pattern of unconstitutional misconduct that municipal
> policy makers were either deliberately indifferent to or tacitly authorized.  *Larson*
> *v. Miller*, 76 F.3d 1446, 1453 (8th Cir. 1996) (*en banc*).

> "A 'policy' is a '*deliberate choice* to follow a course of action . . . made from
> among various alternatives by the official or officials responsible [under state law]
> for establishing final policy with respect to the subject matter in question. '"
> *Hayes v. Faulkner county,* 388 F.3d 669, 674 (8th Cir. 2004) (*quoting Pembaur v.*
> *City of Cincinnati,* 475 U.S. 469, 483-84, 106 S.Ct. 1292, 89 L.E.2d 452 (1986)
> (emphasis added).

After setting forth the law, the Defendant Sheriff argues that there is no evidence that he

had the opportunity to make a "deliberate choice."

The Court finds that the Sheriff had no policy or custom to apprehend and incarcerate acutely mentally ill persons.  And, of course, Mr. Winters was not arrested because he was an "insane person not in the custody of some discreet person." He was arrested for the misdemeanor crime of criminal trespass.  Although the Detention Center has to deal with mentally ill persons – some acutely ill– most of those persons are in custody on criminal charges.  They are pre-trial detainees.  And, most pre-trial detainees are handled under the *Terry* consent decree entered by Judge Reasoner and which is not under attack here.  How pre-trial detainees are processed under the *Terry* consent decree and Arkansas law is described in considerable detail *infra.*

From the testimony, it appears that the Donald Winters' case may have been the <u>only</u> instance where a person under civil commitment order was housed in the Benton County Detention Facility.

Indeed, the State Defendants pointed out that, state-wide, few acutely mentally ill persons ordered into the State Hospital system end up in jail.  And, the overall evidence does not reveal any widespread pattern of holding civil committees in jail.

The Defendant Sheriff states in his Post Trial Brief:

In the context of this litigation, there is no evidence that, at the time of the alleged violation of Donald Winters' constitutional rights, there was a widespread and persistent failure by the county to provide medical assistance to mentally ill individuals.  There is no evidence that a county policymaker was aware of a county failure and was either deliberately indifferent to or tacitly approved of such conduct.  There is no evidence that the alleged deprivation of Donald Winters' constitutional rights was caused by a custom of failing to provide medical assistance to mentally ill individuals. *Id.*

Plaintiff's allegation regarding County Defendant's alleged policy or custom is that "Sheriff Ferguson routinely allowed mentally ill inmates to be booked into his jail, where he kept them, even though he well knew that his facility was not equipped to care for citizens such as Donald Winters" and that Sheriff "Keith Ferguson ratified, had defacto custom, or an actual policy that allowed his jailers

to incarcerate persons such as Donald Winters, even though his facility was not properly equipped." This has not been proven. In fact, the proof is the contrary. The Benton County officers attempted to transport Donald Winters to an appropriate facility on at least three occasions. The three facilities (as well as the Plaintiff, himself) refused to accept custody of Donald Winters. The real problem is that presented by the County Defendant's cross-claim against the State. There was no state system in place for the treatment of Donald Winters, a mentally ill person who should have been in a mental illness treatment facility and not a jail. When the County Defendant tried to get Donald Winters into mental illness treatment facility, none was available.

(County Defendant's Post-Trial Br., Docket No. 103, pp. 6-7).

The Court agrees that the Sheriff had no option but to maintain custody of Donald Winters in order to protect him and others because neither Ozark Guidance Center, Bates Hospital, Darin Winters or the ASH would accept custody of him.

### (b)    § 1983 Claims

42 U.S.C. § 1983 provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

In their post-trial briefs, Separate Defendants Arkansas Department of Health and Human Services (ADHHS) and its Director John Selig argue:

A State or state agency is not a "person" within the meaning of Section 1983. *Will v. Mich. Dept. Of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed. 2d 45 (1989). An action for money damages cannot be brought under Section 1983 against a state official in his official capacity as the representative of a state or a state agency, since no cause of action could be brought directly against the state or a state agency. *Id.* at 71. Therefore, the County Defendant's cross claim and any claim brought by the plaintiff under 42 U.S.C. § 1983 must be dismissed.

In any event, the plaintiff and cross complainant have failed to meet their burden of proof under 42 U.S.C. § 1983. To succeed on a claim under Section 1983, the

plaintiff must prove that defendant's actions were the cause in fact and the proximate cause of the plaintiff's injury or in this case his death.  *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed. 2d 112 (1990), and *Clark v. Mann*, 562 F.2d 1104 (8th Cir. 1977).  The testimony in this case clearly established that Mr. Winters died of an undiagnosed perforated duodenal ulcer.  As such, any action, or inaction, by separate defendant was not the proximate cause of death.

(State Defendants' Post-Trial Br., Docket No. 105, pp. 1-2).

The Court agrees.  And the Plaintiff appears to likewise agree.  As stated in Plaintiff's Response to Post-Trial Briefs: "Although Plaintiff concedes that the State may not be held liable at law under Section 1983, Plaintiff urges the Court to hold the State liable under the RA and ADA" (referencing the Rehabilitation Act of 1973 and the Americans With Disabilities Act of 1990).

### (c)   ADA and Section 504 Liability

The United States Supreme Court has found that state prisons fall within the statutory definition of "public entity," and may be liable under the ADA and Section 504 for denying prisoners the benefits of their programs, services or activities.  *Pennsylvania Dept. Of Corrections v. Yeskey*, 524 U.S. 206, 118 S.Ct. 1951(1998).  While *Yeskey* involved the denial of access to a "prison boot camp program," the Supreme Court opined in dicta that failure to provide "medical 'services'" may constitute discrimination under the ADA/Rehabilitation Act.

Several Circuit Courts have followed this reasoning, stating that "pretrial detainees . . . plainly have a Fourteenth Amendment due process right 'to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide.'" *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.,* 402 F.3d 1092, 115 (11th Cir. 2005) (*quoting Belcher v. City of Foley*, 30 F.3d 1390, 139;6 (11th Cir. 1994)).  Similarly, the Sixth Circuit opined:

> Thus it is that fundamental fairness and our most basic conception of due process mandate that medical care be provided to one who is incarcerated and may be suffering from serious illness or injury. This is not to say that every request for medical attention must be heeded nor that courts are to engage in the process of second-guessing in every case the adequacy of medical care that the state provides. But where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process.

*Westlake v. Lucas,* 537 F.2d 857, 860 (6th Cir. 1976).

The Fifth Circuit has held that pretrial detainees "must be provided with 'reasonable medical care, unless the failure to supply it is reasonably related to a legitimate government objective.'" *Rhyne v. Henderson County,* 973 F.2d 386, 391 (5th Cir. 1992). However, "[i]nadequate medical care does not provide a basis for an ADA claim unless medical services are withheld *by reason of* a disability." *Marlor v. Madison County, Idaho,* 2002 WL 31554037 at *1 (9th Cir. Nov. 14, 2002) (emphasis in original).

The Due Process Clause of the Fourteenth and Eighth Amendments protect against punishment "prior to an adjudication of guilt." However, not every disability incident to incarceration amounts to "punishment." "Deliberate indifference" to the medical needs of incarcerated persons is the standard for both convicted persons and pre-trial detainees.

The U.S. Supreme Court explains the meaning of "deliberate indifference" in *Farmer v. Brennan,* 511 U.S. 825 (1994) as follows:

> We hold the prison official cannot be found liable . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Essentially a plaintiff must show: (1) that he suffered from objectively serious medical needs and, (2) that the prison officials actually knew of a serious medical need and deliberately disregarded same. Here the Sheriff's deputies knew that Mr. Donald Winters was acutely

mentally ill.  But, instead of deliberately disregarding same they did everything possible to get

him into the hands of mental health specialists.  They were not aware of any serious non-

psychiatric  "medical need."  The medical staff at Bates had presumably dealt with the

dehydration problem and had released Mr. Winters as "stable."  At no time did Sheriff's deputies

have any actual knowledge, nor was there any reason for them to believe, that by detaining Mr.

Winters in jail they created a risk of his death.

> As argued by the Defendant Sheriff:
>
> [T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge."  *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996).  In *Dulany v. Carnahan*, 132 F.3d 1234 (8th Cir. 1997), the Eighth Circuit said:
>
>> "As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment.  Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed. 2d 252 (1973) Mere negligence or medical malpractice, however are insufficient to rise to a constitutional violation.  *Id*. at 106, 97S S.Ct. at 292."

(County Defendant's Post Trial Br., Docket No. 103, p.11).

Here, the Sheriff and his deputies were unaware of the serious and life-threatening

condition of peritonitis.  Further, they had no reason to believe that a temporary delay in

admission to the ASH would adversely effect his prognosis in relation to his mental health

problems.  No physician or mental health expert advised them that the delay in being admitted to

the ASH would have such an effect.

The Court observes that the various protocols, statutes and regulations for the handling of

the mentally ill in Arkansas contemplate delays many of which are occasioned by the need to

protect the legal and constitutional rights of such persons.

**(d)** **Sovereign Immunity**

In the telephone conference of November 8, 2005, the Court discussed the interplay

between the ADA and state sovereign immunity and the precedents relating thereto leading up to

the case *U.S. v. Georgia*, __ U.S. __, 126 S.Ct. 877 (2006), which was to be argued in the

Supreme Court the week after the telephone conference.  Keeping that discussion in mind the

Court now supplements same by an analysis of *U.S. v. Georgia.*

The Plaintiff in the *Georgia* case was a paraplegic inmate who claimed his constitutional

rights were violated by the prison's failure to accommodate to his needs as a wheel-chair bound

person resulting in his inability to use the bathroom.  He also claimed that he was denied access

to certain prison programs which were available to non-disabled inmates.  The first issue was

whether Title II of the ADA abrogated the state's sovereign immunity.  The Court concluded:

> insofar as Title II creates a private cause of action for damages against the States
> for conduct that *actually* violates the Fourteenth Amendment, Title II validly
> abrogates state sovereign immunity. The Eleventh Circuit erred in dismissing
> those of Goodman's Title II claims that were based on such unconstitutional
> conduct.  (Emphasis in the original).

*Georgia*, 126 S.Ct. at 882.

Statutes under Section 5 of the Fourteenth Amendment which enforce the provisions of

the Fourteenth Amendment will abrogate state sovereignty.  To constitute a valid claim the

conduct alleged must actually violate the Fourteenth Amendment so a claim for monetary

damages will only be permitted if the plaintiff proves an actual constitutional violation.  In the

context of this case Plaintiff claims that the Defendants violated his constitutional right to be free

from cruel and unusual punishment under the provisions of the Fourteenth and Eighth

Amendments.  Since the Court has already determined that the Plaintiff here has not established

- 79 -

that either of the Defendants acted in deliberate indifference to his constitutional rights, there is no predicate for recovering damages.

Therefore, since Plaintiff claims an "actual" violation of the Fourteenth Amendment, Title II of the ADA would abrogate Arkansas' sovereign immunity and permit an action for damages against the State.  But, Plaintiff must meet the deliberate indifference standard to prevail, and the Court has already ruled that he failed to meet that standard.

    **4.**    **Discussion of Critical Circumstances**

    **(a)**    **Donald Winters' Dual Status: Pre-Trial Detainee and Civil Committee**

As acknowledged by Plaintiff in his post-trial brief, his father was arrested on a criminal trespass charge pursuant to Ark. Code. Ann §5-39-203.  Although a misdemeanor, this charge carried the possibility of a term of imprisonment.  It is true that the officers arresting Mr. Winters believed and understood that he was a mentally ill person.  Nevertheless, he was arrested for criminal trespass after refusing to stop pounding on his neighbor's front door and refusing to leave his neighbor's property.  The day after his arrest and incarceration he was brought before Magistrate Garten for his first judicial appearance on the criminal charge.  The Court conducted the hearing around 7:00 p.m. on Sunday, December 29, 2002, pursuant to Rule 8.3 of the Arkansas Rules of Criminal Procedure, and determined that probable cause existed for such charge.  Bond was set at $500 and the Defendant Mr. Winters was directed to appear in the District Court of Benton County on January 5, 2003, at 7:30 a.m.  The Court noted that this was a "must appear" citation.

In such situations as we find here, there obviously exists a potential tension between the requirements imposed by the criminal laws of the State and the need to deal with the psychiatric problems of the detainee under civil law standards.  While Mr. Donald Winters probably could

have been arrested pursuant to Ark. Code Ann. § 20-47-101, which requires peace officers "to arrest any insane person who is not in the care of some discreet person and to bring him/her before a magistrate," he was not, and understandably so.  But the deputies had the neighbor's complaint and also information that Donald Winters might be considered to be in the care of a "discreet person," to-wit, his son, Darin.  Regardless of the reason, Mr. Donald Winters found himself, after his arrest, in the criminal justice system by virtue of the criminal trespass charge. And, he would remain subject to that charge until it was dismissed by the Court or nol prossed by the prosecuting attorney.

Following his arrest, on December 31, 2002, at 1:00 p.m., a civil commitment hearing was commenced upon the petition of Mr. Donald Winters' son. At the end of the hearing a civil commitment order was entered directing that Donald Winters be involuntarily admitted "to the Arkansas Mental Health System for a period of seven (7) days for evaluation to determine whether treatment for mental illness is appropriate."  Ozark Guidance Center was identified in that order as the "designated receiving facility."

The trial record does not reflect what action was taken, if any, on the pending criminal trespass charge.  Further, assuming the charge was nol prossed or dismissed the record does not show when that action was taken.  Therefore, when Ozark later that night (December 31, 2002) denied admission to Mr. Winters and he was then returned to the Detention Center; his status is unclear. Was his status solely that of a civil committee or did his concurrent status as a pre-trial detainee also continue.

It is interesting to compare Plaintiff's view of how persons under civil commitment orders should be processed ("same day admission") with the manner in which pre-trial detainees

under Circuit Court Orders are processed.  Pre-trial detainees are handled[10] pursuant to a

settlement agreement entered into September 2002, between the Plaintiffs and the Division of

Mental Health Services of the Arkansas DHS in what is referred to in the *Terry* case.  By virtue

of a Settlement Agreement, pre-trial detainees are subject to an order under Ark. Code Ann. § 5-

2-310 for the detainee to be restored to competency, the detainee is triaged within 72 hours

(calendar days, not work days).  Triage consists of a clinical review of the case by an evaluation

professional.  The Settlement Agreement then states:

> c.     Triage will establish three (3) levels of treatment priority and the detainee
>         will be admitted to treatment according to these levels.
>> i.      Priority I. Requires treatment to be furnished within 48 hours.
>>         Priority I is defined as:
>>> 1.      Lack of treatment would result in reasonable probability of death
>>>         or serious bodily injury.
>>> 2.      Other clinical signs and symptoms which the DMHS Medical
>>>         Directors deems appropriate for this level of acuity.
>> ii.     Priority II requires treatment to be furnished within 15 days.
>>         Priority II is defined as:
>>>         Lack of treatment would result in reasonable probability of serious
>>>         Physical or mental debilitation.
>> iii.    Priority III requires treatment to be furnished within 45 days.
>>         Priority III is defined as:
>>>         Lack of treatment poses no reasonable probability of any
>>>         debilitation.

*(Terry* case, Settlement Agreement at p. 2, 4:01-CV-458, Docket #45).

The State Defendants in their post-trial brief argue that although the *Terry* case is not

directly on point "it does provide guidance in this civil commitment matter."  In priority one

cases under *Terry* where a lack of treatment "would result in a reasonable probability of death or

serious injury, treatment must be provided within 48 hours <u>after triage</u>.  And, since pre-trial

---

[10]  Throughout this opinion, the Court's reference to the "*Terry* case" refers to a case
handled by The Honorable Stephen Reasoner, United States District Court for the Eastern
District of Arkansas, Case No. 4:01-CV-458.

detainees must be triaged within 72 hours, treatment in the highest priority cases could

apparently be delayed for as long as <u>five days</u>.  In this, the *Winters* case, Mr. Winters was ordered

on December 31, 2002 to be received for a seven day civil evaluation.  That evaluation was to

determine whether treatment for mental illness would be appropriate.

(b)      <b>Time Frame</b>

The limited time frame presented by the facts here dramatically undercut Plaintiff's

claims.  The Plaintiff was arrested on December 28, 2002.  He died four days and 16 hours later

on New Year's Day, January 1, 2003.  The Defendant Sheriff and his deputies made every effort

to get Mr. Winters into the hands of medical and psychiatric professionals.  Those professionals,

who are not parties to this action, refused to accept him and did nothing of consequence to

provide pro-active follow up services for him while he was in the jail.

When the Defendant Sheriff's deputies were unable to prevail upon Bates Medical Center

to take Donald Winters on December 28, 2002, they contacted the prosecuting attorney's office

about getting a civil commitment order, but were informed this could not be done until December

31, 2002.

Neither of the remaining two parties Defendants had anything to do with causing the

delay in bringing the matter before the Probate Division of the State Circuit Court.  After the

civil commitment order was entered, Mr. Winters, pursuant thereto, was taken promptly to the

Ozark Guidance Center where he stayed for about two hours.  The medical personnel there

determined that there was no bed then available for him at the Arkansas State Hospital so they

forcefully medicated him and then promptly sent him back to the jail while noting that he was

severely dehydrated.  The jail doctor followed up immediately by sending Mr. Winters to Bates

where he was, according to the professionals there, properly hydrated, fully examined and

released as "stable."

The details about Mr. Winters' actions and behavior after his return to the jail from Bates on the evening of December 31, 2002, are set out in the Court's findings above.

Mr. Donald Winters died from a condition that was not known or suspected by any of the medical personnel who examined him after his arrest on December 28, 2002.  Nor was that condition known or suspected by either of the Defendants, or by their deputies or agents.

The Court finds that nothing either Defendant did caused or contributed to Mr. Donald Winters' death.  Indeed, the State Defendant had no knowledge of the existence of Mr. Winters until receiving a request from Ozark Guidance Center for Mr. Winters' admission to the Arkansas State Hospital on the evening of December 31, 2002, less than 24 hours before his death.

The Plaintiff seeks a ruling from the Court that Mr. Donald Winters was denied his constitutional and/or statutory rights by virtue of the fact that the State Defendants did not have and follow a "same day" admission policy.  The testimony suggests that at least two states have such a policy.  And several witnesses testified that such a policy is not a "pie in the sky" concept, but a realistic goal.  However, while the "Best Practice" standard might require such a policy, the United States Constitution does not.[11] The Court further notes in passing that even if Arkansas had had such a same day policy on December 31, 2002, it is more likely so, than not so, that such a policy would not have altered the outcome in this particular case.

If, by the time Ozark contacted ASH for a bed on New Year's Eve, a bed had been

---

[11]  No state-law based causes of action are asserted in the Second Amended Complaint. However, in the post trial briefs there are suggestions of reliance on state law and in particular on the Constitution of the State of Arkansas.  These possible state based claims are discussed elsewhere herein.

available, it is clear that Donald Winters would nevertheless have been first transferred to Bates

to deal with the dehydration problem before even considering undertaking the long trip at night

to Little Rock.  And, if so, by the time he was hydrated and determined to be "stable" well after

dark on December 31, 2002, is it not likely that he would have remained at the jail until at least

the next morning before being transferred to Little Rock?  Keep in mind that no one at that time

was aware of, or concerned about, any life-threatening or even serious <u>medical</u> problem.  If

Donald Winters was kept at the jail overnight and then taken out of the jail by 9:30 a.m. on

January 1, 2003, and transferred to the Arkansas State Hospital in Little Rock it appears likely

that he would have been first seen by the ASH medical staff sometime between 1:30 and 2:00

p.m.  ASH would then go through its admission procedures, and if any serious medical problems

were noted, Mr. Winters would, according to the testimony, then be sent to some Emergency

Room in another hospital before ASH would accept him as a psychiatric patient.  (This is

because, according to the evidence, ASH is not staffed or equipped to handle any significant

medical problems.)  And, we know Mr. Winters died around 4:30 p.m. on January 1, 2003.  The

Court believes the more likely scenario to be that Mr. Winters would have been scheduled for

transfer to Little Rock on January 2, 2003, because of the holiday and because there was no

known compelling urgency.  Under this hypothesis, Mr. Winters would still have died, as he did,

in the Benton County Detention Center around at 4:30 p.m. on January 1, 2003.

       The Court is further convinced that if the medical personnel at Ozark believed that Mr.

Winters' life was in danger <u>because of his mental illness</u> if he did not gain admission to ASH that

day, those professionals would have evidenced that concern by seeking still other alternative

placement in or out of Arkansas, by leaning much more heavily on ASH (with dire warnings) and

at least by following up and attending to Mr. Winters' needs by providing their services to him at

the jail ("house calls") as they had done before in other cases.  But, no one believed that a short

delay in Winters' admission to ASH would result in his death due to his psychosis or seriously

and negatively impact his prognosis.  Certainly, no one expressed such concerns to either

Defendant.


V.       **CONCLUSION**

        The State Defendants have stated that Arkansas has adopted a reasonable and fair plan for

providing mental health and psychiatric services for the indigent and uninsured acutely mentally

ill.  They contend that the priority accorded persons being detained in jail upon non-felony

charges is reasonable, fair, and adequate.  And, they further contend that same-day access for

such detainees as Mr. Winters is not required, suggesting that to require such would actually

waste scarce resources to the detriment of the entire group of the acutely mentally ill.

        Plaintiff's experts take a different view, contending that the system is flawed, inadequate

and unfair.  They argue that a same-day admission policy is reasonable and attainable.

        One thing is clear to this Court: our County and City jails should not become our mental

hospitals by default.

        The solution lies with the political branches of our state government – the Executive and

Legislative branches, and particularly the General Assembly, which has the power to bring before

it all of the interested parties: mental health experts, law enforcement, financial and budget

experts.  As stated in *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 442-43, 105

S.Ct. 3249, 3256 (1985):

        How this large and diversified group is to be treated under the law is a difficult
        and often technical matter, very much a task for legislators guided by qualified
        professionals and not by the perhaps ill-informed opinions of the judiciary.

While the Court has concluded that Plaintiff's causes of action must fail under the applicable law, it nevertheless again observes that this lawsuit is important because it has served to bring to the public's attention a very serious, complex, and difficult problem, *to-wit*: how to properly **and promptly** deal with acutely mentally ill persons who for one reason or another end up in our city and county jails.

For the reasons stated in this Memorandum Opinion, the Second Amended Complaint of the Plaintiff will be dismissed.  Judgment will be entered separately.

Dated this 2nd day of June, 2006.

_____/s/Garnett Thomas Eisele_____
UNITED STATES DISTRICT JUDGE